**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------------X

LUKE MATTHEWS, CARLOS GOMEZ, GENTL BONDS,
ROBERT SMITH, ROBERT NEGRON, and KASIEM CHAVES,

                      Plaintiffs,

      -against-

ANDREW CUOMO, Governor of the State of New York; NEW
YORK STATE DEPARTMENT OF CORRECTIONS AND
COMMUNITY SUPERVISION ("DOCCS"); NEW YORK
STATE OFFICE OF MENTAL HEALTH ("OMH"); DAVID
ROCK, Superintendent of Upstate Correctional Facility; OSMAN
YILDIZ, Sullivan Correctional Facility Mental Health Specialist;
CLINTON CORRECTIONS OFFICERS JOHN and/or JANE
DOES 1, 2, 3, etc.; UPSTATE CORRECTIONS OFFICERS
JOHN and/or JANE DOES 1, 2, 3, etc.; NEW YORK STATE
OFFICE OF SPECIAL INVESTIGATIONS ("OSI") OFFICERS
JOHN and/or JANE DOES 1, 2, 3, etc.; NEW YORK STATE
POLICE ("NYSP") OFFICERS JOHN and/or JANE DOES 1, 2,
3, etc.; CORRECTIONAL EMERGENCY RESPONSE TEAM
("CERT") OFFICERS JOHN and/or JANE DOES 1, 2, 3, etc.;
OMH MEDICAL PROFESSIONALS JOHN and/or JANE DOES
1, 2, 3 etc.; UPSTATE MEDICAL OFFICIALS JOHN and/or
JANE DOES 1, 2, 3 etc.; and SULLIVAN MEDICAL
OFFICIALS JOHN and/or JANE DOES 1, 2, 3 etc., all of whom
are sued in their individual capacities,

                    Defendants.

-------------------------------------------------------------------------------X

**COMPLAINT**

**JURY TRIAL
DEMANDED**

Plaintiffs LUKE MATTHEWS, CARLOS GOMEZ, GENTL BONDS, ROBERT

SMITH, ROBERT NEGRON, and KASIEM CHAVES, by their attorneys, Beldock Levine &

Hoffman LLP, as and for their Complaint, alleges as follows:

## PRELIMINARY STATEMENT

      1.    This civil rights action seeks redress under 42 U.S.C. § 1983 and New York State

law for injuries Plaintiffs suffered from the unconstitutional conduct of Defendants.

2.     After Richard Matt and David Sweat escaped from Clinton Correctional Facility on June 6, 2015, Governor Andrew Cuomo and officials in charge of the New York State Department of Corrections and Community Supervision ("DOCCS") launched an unbridled investigation that trampled the constitutional rights of numerous Clinton inmates, including the Plaintiffs, who were all inmates at Clinton when the escape occurred. Plaintiffs were assaulted by DOCCS Corrections Officers, unlawfully held in solitary confinement, and, to this day, continue to be denied adequate medical treatment for the physical and psychological injuries they sustained. In the course of this mistreatment, several Plaintiffs were subjected to the most abhorrent racist and religious epithets. The gravity of these actions, as discussed in greater detail below, embody the very antithesis of civil rights, including the constitutional right to be free from cruel and unusual punishment and the right to equal protection under the law. The fact that David Sweat and Richard Matt were aided in their escape by Clinton employees, and not incarcerated people, makes the sadistic treatment of Plaintiffs all the more outrageous.

3.     For the substantial injuries they suffered, Plaintiffs seek (i) compensatory damages for physical, psychological and emotional pain and distress, as well as financial loss; (ii) punitive damages to deter such intentional or reckless deviations from well-settled constitutional law; and (iii) such other and further relief, including costs and attorney's fees, as this Court deems equitable and just.

## JURISDICTION

4.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343(a)(3) and (a)(4), as this action seeks redress for the violation of plaintiffs' constitutional and civil rights.

5.     Plaintiffs further invoke this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over any and all state law claims that are so related to the federal claims that they form part of the same case or controversy.

**VENUE**

6.     Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1), as this is the judicial district in which five of the six plaintiffs and several defendants reside.

**JURY DEMAND**

7.     Plaintiffs demand a trial by jury in this action on each and every one of their claims for which jury trial is legally available.

**THE PARTIES**

8.     LUKE MATTHEWS is an African-American male and United States citizen who is currently incarcerated at Sullivan Correctional Facility. At all times relevant herein, Plaintiff was incarcerated at Clinton Correctional Facility, Upstate Correctional Facility, and Sullivan Correctional Facility.

9.     CARLOS GOMEZ is a Latino male and United States citizen who is currently incarcerated at Great Meadow Correctional Facility. At all times relevant herein, Plaintiff was incarcerated at Clinton Correctional Facility, Upstate Correctional Facility, and Sullivan Correctional Facility.

10.     GENTL BONDS is an African-American male and United States citizen who currently incarcerated at Sullivan Correctional Facility. At all times relevant herein, Plaintiff was incarcerated at Clinton Correctional Facility, Upstate Correctional Facility, and Sullivan Correctional Facility.

11.     ROBERT SMITH is an African-American male, practicing Muslim, and United States citizen who currently incarcerated at Sullivan Correctional Facility. At all times relevant herein, Plaintiff was incarcerated at Clinton Correctional Facility, Upstate Correctional Facility, and Sullivan Correctional Facility.

12.     ROBERT NEGRON is a Latino male and United States citizen who is currently incarcerated at Sullivan Correctional Facility. At all times relevant herein, Plaintiff was incarcerated at Clinton Correctional Facility, Upstate Correctional Facility, and Sullivan Correctional Facility.

13.     KASIEM CHAVES is an African-American male and United States citizen who is currently incarcerated at Sullivan Correctional Facility. At all times relevant herein, Plaintiff was incarcerated at Clinton Correctional Facility, Upstate Correctional Facility, and Sullivan Correctional Facility.

14.     Defendant ANDREW CUOMO was at all times relevant herein the Governor of the State of New York and a State policymaker and served as the Executive of State departments and agencies. At all relevant times herein, Defendant CUOMO was acting under color of state law and in the scope of his capacity as an agent, servant, and/or employee of the State of New York. Defendant CUOMO is sued in his individual capacity.

15.     The New York State Department of Corrections and Community Supervision ("DOCCS") is a department of the State of New York with its central office in Albany, New York. DOCCS is responsible for the confinement and habitation of incarcerated individuals held in correctional facilities throughout New York. DOCCS receives federal funding.

16.     The New York State Office of Mental Health ("OMH") is a department of the State of New York with its central office in Albany, New York. OMH is responsible for operating and

managing psychiatric services across the State, including at Sullivan Correctional Facility. As an OMH Level 1 facility, Sullivan is required to provide access to residential mental health care and have full-time mental health staff available at the facility. The mental health service providers at Sullivan are OMH staff members. OMH receives federal funding.

17.     At all times relevant herein, DAVID ROCK was the Superintendent of Upstate Correctional Facility. As Superintendent, ROCK was the highest-ranking DOCCS employee at Upstate Correctional Facility, and was responsible for the supervision, oversight, and discipline of the uniformed security staff in Upstate Correctional Facility. He was also responsible for the care, custody, and control of all individuals incarcerated in Upstate Correctional Facility. While carrying out the acts and omissions alleged herein, ROCK was acting in the scope of his capacity as an agent, servant, and/or employee of DOCCS, and acted under color of state law. Defendant ROCK is sued in his individual capacity.

18.     Upon information and belief, at all times relevant herein, OSMAN YILDIZ was a social worker at Sullivan Correctional Facility and an employee of OMH. Defendant YILDIZ is sued in his individual capacity.

19.     OMH MEDICAL PROFESSIONALS JOHN and/or JANE DOES 1, 2, 3, etc. are OMH agents and/or employees whose names are presently unknown and at all relevant times herein were medical and mental health care providers employed by OMH who were responsible for the medical care of people incarcerated at DOCCS facilities. At all relevant times herein, the OMH MEDICAL PROFESSIONALS acted under color of state law and within the scope of their capacities as agents, servants, and/or employees of OMH. The OMH MEDICAL PROFESSIONALS are sued in their individual capacities.

20. CLINTON CORRECTIONS OFFICERS JOHN and/or JANE DOES 1, 2, 3, etc. were, at all relevant times, Clinton Correctional Facility corrections officers who physically assaulted without lawful justification Plaintiffs and/or failed to appropriately respond to Plaintiffs' medical needs and, upon information and belief, participated in, had knowledge of, and/or failed to intervene to stop the assault of Plaintiffs. At all times relevant herein, the CLINTON CORRECTIONS OFFICERS were acting under color of state law and within the scope of their capacity as agents, servants, and employees of DOCCS. The CLINTON CORRECTIONS OFFICERS are sued in their individual capacities.

21. UPSTATE CORRECTIONS OFFICERS JOHN and/or JANE DOES 1, 2, 3, etc. were, at all relevant times, Upstate Correctional Facility corrections officers who physically assaulted without lawful justification Plaintiffs and/or failed to appropriately respond to Plaintiffs' medical needs and, upon information and belief, participated in, had knowledge of, and/or failed to intervene to stop the assault of Plaintiffs. At all times relevant herein, the UPSTATE CORRECTIONS OFFICERS were acting under color of state law and within the scope of their capacities as agents, servants, and employees of DOCCS. The UPSTATE CORRECTIONS OFFICERS are sued in their individual capacities.

22. CORRECTIONAL EMERGENCY RESPONSE TEAM ("CERT") OFFICERS JOHN and/or JANE DOES 1, 2, 3, etc. were, at all relevant times, DOCCS corrections officers who physically assaulted without lawful justification Plaintiffs and/or failed to appropriately respond to Plaintiffs' medical needs and, upon information and belief, participated in, had knowledge of, and/or failed to intervene to stop the assault of Plaintiffs. At all times relevant herein, the CERT OFFICERS were acting under color of state law and within the scope of their

capacities as agents, servants, and employees of DOCCS. The CERT OFFICERS are sued in their individual capacities.

23.     NEW YORK STATE OFFICE OF SPECIAL INVESTIGATIONS ("OSI") OFFICERS JOHN and/or JANE DOES 1, 2, 3, etc. were, at all relevant times, DOCCS agents and/or employees who physically assaulted without lawful and/or participated in, had knowledge of, and/or failed to intervene to stop the assault of Plaintiffs. At all times relevant herein, the OSI OFFICERS were acting under color of state law and within the scope of their capacities as agents, servants, and employees of DOCCS. The OSI OFFICERS are sued in their individual capacities.

24.     NEW YORK STATE POLICE ("NYSP") OFFICERS JOHN and/or JANE DOES 1, 2, 3, etc. were, at all relevant times, NYSP officers who physically assaulted without lawful justification Plaintiffs and/or failed to appropriately respond to Plaintiffs' medical needs and, upon information and belief, participated in, had knowledge of, and/or failed to intervene to stop the assault of Plaintiffs. At all times relevant herein, the NYSP OFFICERS were acting under color of state law and within the scope of their capacities as agents, servants, and employees of the State of New York. The NYSP OFFICERS are sued in their individual capacities.

25.     UPSTATE CORRECTIONAL FACILITY MEDICAL OFFICIALS JOHN and/or JANE DOES 1, 2, 3 etc. were medical and/or mental health care providers employed by DOCCS who were responsible for the medical care of people incarcerated at Upstate Correctional Facility. The UPSTATE MEDICAL OFFICIALS participated in, had knowledge of, and/or failed to intervene in the denial of adequate medical care to Plaintiffs MATTHEWS, GOMEZ, BONDS, and SMITH. The UPSTATE MEDICAL OFFICIALS' duties included, but were not limited to, caring for all patients in their assigned areas of Upstate Correctional Facility, including, but not limited to, cell visits, physical and psychological examinations, identification of acute and chronic

conditions, design and implementation of appropriate plans to facilitate care, provision of medications, provision of psychiatric and/or psychological counseling, coordination of treatment with other providers at Upstate Correctional Facility, direct oversight and supervision of medical staff, and/or provision of emergency medical care. At all relevant times herein, the UPSTATE MEDICAL OFFICIALS were acting under color of state law and within the scope of their capacity as agents, servants, employees, and/or contracted personnel of DOCCS. They were required to carry out their responsibilities in a manner consistent with the legal mandates that govern the operation of New York State correctional facilities, including DOCCS policies, procedures, directives, and protocols, in additional to all relevant local, state, and federal statutes and regulations. The UPSTATE MEDICAL OFFICIALS are sued in their individual capacities.

26. SULLIVAN CORRECTIONAL FACILITY MEDICAL OFFICIALS JOHN and/or JANE DOES 1, 2, 3 etc. were medical and/or mental health care providers employed by DOCCS who were responsible for the medical care of people incarcerated at Sullivan Correctional Facility. The SULLIVAN MEDICAL OFFICIALS participated in, had knowledge of, and/or failed to intervene to remedy the denial of adequate medical care to Plaintiffs MATTHEWS, GOMEZ, BONDS, and SMITH. Their duties included, but were not limited to, caring for all patients in their assigned areas of Sullivan Correctional Facility, including, but not limited to, cell visits, physical and psychological examinations, identification of acute and chronic conditions, design and implementation of appropriate plans to facilitate care, provision of medications, provision of psychiatric and/or psychological counseling, coordination of treatment with other providers at Sullivan Correctional Facility, direct oversight and supervision of medical staff, and/or provision of emergency medical care. At all relevant times herein, the SULLIVAN MEDICAL OFFICIALS were acting under color of state law and within the scope of their

capacities as agents, servants, employees, and/or contracted personnel of Defendant DOCCS. Their responsibilities were required to be carried out in a manner consistent with the legal mandates that govern the operation of New York State correctional facilities, including DOCCS policies, procedures, directives, and protocols, in additional to all relevant local, state, and federal statutes and regulations. The SULLIVAN MEDICAL OFFICIALS are sued in their individual capacities.

## STATEMENT OF FACTS

*Introduction*

27.     After Richard Matt and David Sweat escaped from Clinton Correctional Facility ("Clinton"), Plaintiffs and scores of other people incarcerated at Clinton were terrorized by Clinton Corrections Officers, NYSP Officers, OSI Officials, and CERT Officers. Clinton was placed on lockdown and all incarcerated people were confined to their cells.

28.     Over the course of the next ten days, several people incarcerated at Clinton, including Plaintiff GOMEZ, were interrogated about the escape and the whereabouts of Matt and Sweat. This interrogation included physically assaults, as well as threats to link the interrogees to the escape if they did not provide useful information.

29.     Approximately ten days after the escape, CERT Officers began transferring people incarcerated at Clinton to Upstate Correctional Facility ("Upstate"), a dedicated Special Housing Unit ("SHU") facility. During the transfer, CERT Officers physically assaulted several incarcerated people, including Plaintiffs MATTHEWS, BONDS, and SMITH, and used the most abhorrent racist and religious epithets.

30.     Upon arriving at Upstate, CERT Officers ordered Plaintiffs not to tell the medical staff about their injuries and to say that they did not need medical attention. Fearful for their safety,

Plaintiffs obeyed the CERT Officers' order. Their subsequent requests for medical attention were denied. Approximately 65 incarcerated people, including Plaintiffs, were kept in solitary confinement at Upstate for an extended period of time, where they were not given a change of clothing, access to showers, and other basic human needs.

31. Following Plaintiffs' transfer to Sullivan Correctional Facility, they did not receive adequate medical attention for the injuries they sustained as a result of Defendants' handling of the investigation into the Clinton escape.

*The Escape of Richard Matt and David Sweat*

32. The morning of June 6, 2015, officers at Clinton discovered that two inmates housed in honor block, Richard Matt and David Sweat, were not in their cells.

33. Clinton was immediately placed on lockdown.

34. Sometime that morning, the Governor of New York, Defendant CUOMO, arrived at Clinton.

35. Upon information and belief, Defendant CUOMO ordered New York State Office of Special Investigation ("OSI") Officers to do whatever was necessary to obtain information about the escape.

*Interrogations*

36. Clinton Corrections Officers, as well as OSI officers and New York State Police ("NYSP") officers, began interrogating inmates at Clinton.

37. Upon information and belief, Defendant CUOMO, as well as Acting DOCCS Commissioner Anthony Annucci, DOCCS Deputy Commissioner Joseph Bellnier, and former Clinton Correctional Facility Superintendent Steven Racette, approved and encouraged the

interrogation methods Clinton Corrections Officers, OSI investigators, Correctional Emergency Response Team ("CERT") Officers, and NYSP Officers used.

38.     Plaintiff GOMEZ was interrogated twice on June 6 by Clinton Corrections Officers.

39.     During the interrogation, Plaintiff GOMEZ was placed in a chair, with his hands cuffed behind the chair, as Clinton Corrections Officers repeatedly slapped him in the face, choked him, and punched him in his head and ribs.

40.     Plaintiff GOMEZ did not know anything about the escape, but the officers assaulted him all the same.

41.     Over the next nine days, Plaintiff GOMEZ was interrogated approximately six more times and each time, he was similarly assaulted, choked, and threatened by Clinton Corrections Officers.

42.     On one of these occasions, JOHN DOE OSI OFFICERs, who told Plaintiff GOMEZ that he was working under the direction of Defendant CUOMO, stated, in sum and substance, "I can give you clemency, a $100,000 reward, and reconnect you with your daughter if you tell me where Matt and Sweat are."

43.     When Plaintiff GOMEZ responded that he knew nothing about the escape, the JOHN DOE OSI OFFICER threatened Plaintiff GOMEZ and stated that they would find a way to link him to the escape.

44.     Upon information and belief, interrogations of other incarcerated people included slamming heads into desks, wrapping heads with plastic bags, slamming heads into pipes, punches to the head and ribs, and threats of waterboarding.

45.     On or about June 8th, Clinton Corrections Officers began a facility wide "Cell Frisk."

11

46.     Upon information and belief, cells throughout the facility were rummaged and property was confiscated and destroyed.

47.     Upon information and belief, Clinton Corrections Officers flushed legal paperwork down toilets and smashed televisions, cassette players, and radios by throwing them on the floor and stomping them with their feet.

48.     The property of Plaintiffs MATTHEWS, GOMEZ, BONDS, SMITH, CHAVES, and NEGRON, including legal papers, televisions, and radios, were lost and/or destroyed following the escape.

49.     During the "Cell Frisk," Clinton Corrections Officers yelled to the incarcerated people, in sum and substance, "Don't you dare say a fucking word about this."

50.     On or about June 8th, Clinton Corrections Officers blocked the transmission of television stations to the cells.

51.     Upon information and belief, the JOHN and/or JANE DOE CERT OFFICERS arrived at Clinton on or about June 10, 2016.

52.     Upon information and belief, many, if not all of the CERT Officers, were dressed in a manner that concealed their identity.

53.     On or about June 10th, television service was restored, but English language stations that reported news remained blocked.

54.     However, several incarcerated people were able to learn new information about the escape through Spanish language stations that broadcast news programs and were not blocked.

55.     At some point between the escape and June 15, OSI Officers and Clinton Corrections Officers came to Plaintiff CHAVES's cell and ordered him to attend an "interview" in the laundry room.

56.     Plaintiff CHAVES explained that he did not know anything about Matt and Sweat and refused the interview.

57.     Upon information and belief, incarcerated people in New York State Correctional Facilities have the option of refusing interviews with DOCCS officials.

58.     A Clinton Corrections Officer told Plaintiff CHAVES that if he did not willfully attend the interview he would be physically harmed.

59.     Fearing for his safety, Plaintiff CHAVES said that he would agree to the interview.

*Transport from Clinton Correctional Facility to Upstate Correctional Facility – Day 1*

**Gentl Bonds**

60.     On or about June 15, 2015, CERT Officers, Clinton Corrections Officers, and/or OSI Officers entered Plaintiff BONDS' cell and ordered him to face the wall with his back to the cell door.

61.     After Plaintiff BONDS was pat-frisked and handcuffed he was escorted to the Administrative building by JOHN DOE CERT OFFICERS who yelled, in sum and substance "If you pick up your head we will break your fucking neck."

62.     Plaintiff BONDS complied with the CERT Officers' order, keeping his head down the entire time.

63.     Inside the Administrative building, Plaintiff BONDS was taken to a small room where CERT Officers removed his handcuffs, ordered him to remove his clothes, and conducted a strip search.

64.     Following the strip search, CERT Officers ordered Plaintiff BONDS to balance himself on his knees for an extended period of time, causing extreme pain to his knees and legs.

65.     Eventually, CERT Officers placed shackles on Plaintiff BONDS' ankles and a mechanical, full-body restraint.

66.     Plaintiff BONDS was moved to the Administrative Building's waiting area, where CERT Officers ordered him to sit on a bench, with his head down.

*Kasiem Chaves*

67.     Also on June 15, 2015, CERT Officers entered Plaintiff CHAVES's cell yelling, in sum and substance, "Place your fucking hands on the back of the cell wall. If you remove them we will fuck you up."

68.     CERT Officers forced Plaintiff CHAVES out of his cell and yelled, in sum and substance, "Keep your fucking head down or we will fuck you up."

69.     CERT Officers denied Plaintiff CHAVES' request to bring his prescription eye glasses and medical soles for his boots. To this day, these items have not been replaced.

70.     CERT Officers then escorted Plaintiff CHAVES to the Administrative Building.

71.     In the Administrative Building CERT Officers took Plaintiff CHAVES to a small room where he was strip searched, which included a body cavity search.

72.     Plaintiff CHAVES was then placed in mechanical full-body shackles.

73.     CERT Officers next ordered Plaintiff CHAVES to balance himself on the ridges of a hard plastic chair on his knees for approximately five to ten minutes.

74.     This resulted in severe physical pain to Plaintiff CHAVES.

75.     Plaintiff CHAVES was then escorted into the Administrative Building's waiting area by CERT Officers who ordered him to sit on a bench and keep his head down.

76.     Plaintiff CHAVES complied with the CERT Officers orders.

*Administrative Building Waiting Area*

77.     As Plaintiffs BONDS, CHAVES, and several other incarcerated people sat on the bench, CERT officers walked through the waiting area, threatening everyone with physical force if they lifted their heads or spoke.

78.     Plaintiff BONDS could hear other individuals being assaulted by CERT Officers, but did not lift his head to witness the assault because he feared for his personal safety if he disobeyed an order.

79.     A CERT Officer then stood in front of Plaintiff BONDS and ordered him to stand up.

80.     Plaintiff BONDS compiled with the order.

81.     Another CERT Officer approached Plaintiff BONDS and the two began to escort him toward the building's exit, one behind Plaintiff BONDS, the other to his left.

82.     As Plaintiff BONDS was escorted out of the Administrative Building, the CERT Officer to his left suddenly grabbed and pulled on his full body restraints, causing great pain to his hands and wrists.

83.     At one point, the pain was so extreme, Plaintiff BONDS believed his wrist was about to snap.

84.     The CERT Officer to Plaintiff BONDS' left then yelled, in sum and substance, "Do you need me to take you in the back and adjust your handcuffs?"

85.     The CERT Officer then punched Plaintiff BONDS in the face and yelled, in sum and substance, "Did you not fucking hear me? I asked you a fucking question."

86.     Plaintiff BONDS remained silent.

87.     The CERT Officer behind Plaintiff BONDS then yelled, in sum and substance, "You must be fucking retarded" and pushed him in the back.

88.     The CERT Officer to Plaintiff BONDS left then yelled "Are you trying to resist?" and immediately began punching Plaintiff BONDS in the face.

89.     The CERT Officer behind Plaintiff BONDS then began choking Plaintiff BONDS with his nightstick, eventually lifting him off his feet with the nightstick and slamming him to the ground.

90.     As Plaintiff BONDS lay helplessly on the ground, the two CERT Officers repeatedly kicked Plaintiff BONDS with their steel toed boots.

91.     Eventually, the two CERT Officers grabbed Plaintiff BONDS and raised him to his feet, where one yelled, in sum and substance, "Keep your fucking head down!"

92.     The CERT Officers continued to walk Plaintiff BONDS out of the building.

93.     During this time the CERT Officers repeatedly pushed Plaintiff BONDS into walls, radiators protruding from the walls, gates, and door frames.

94.     Plaintiff BONDS was eventually walked to a bus, where the two CERT Officers forcefully placed him in a seat.

95.     Plaintiff CHAVES was later escorted to the same bus as Plaintiff BONDS and was placed in a seat by CERT Officers.

96.     Plaintiffs BONDS and CHAVES were transported to Upstate Correctional Facility ("Upstate").

97.     Upon arriving at Upstate, Plaintiffs BONDS and CHAVES were placed in a Special Housing Unit ("SHU") without a lawful reason and without any privileges.

98.     SHU is a restrictive form of incarceration where incarcerated people spend approximately 23 hours a day alone in a small cell, where they receive few if any privileges. This includes, fewer showers, limited access to personal materials, no educational, vocational, or

rehabilitative programing, extremely limited time for exercise, and limited meal options, which are served through their cell door.

99.    After arriving at Upstate, Plaintiff BONDS was taken to a nurse, and he informed her of his injuries.

100.    The nurse told Plaintiff BONDS to fill out a sick-call request the following day.

101.    Plaintiff BONDS was then escorted to his cell where he saw a paper stuck to his door, reading, in sum and substance, "Clinton Guys. Do Not Talk To."

102.    Upon information and belief, Defendant ROCK knew of and/or gave the order to ignore those individuals who were transferred from Clinton.

103.    The following day, as per the nurse's instruction, Plaintiff BONDS filled out a sick call request.

104.    No one responded to Plaintiff BONDS' sick call request.

*Transport from Clinton Correctional Facility to Upstate Correctional Facility – Day 2*

**Robert Smith**

105.    On June 16, 2015, CERT Officers approached Plaintiff SMITH's cell as he was sitting on his bed and ordered him to stand up, turn around, and place his hands behind his back.

106.    Plaintiff SMITH complied with the CERT Officers' order as they entered his cell and responded "Yes, Officer."

107.    CERT Officer DOE yelled, in sum and substance, "Shut the fuck up nigger and put your hands behind your fucking back."

108.    As Plaintiff SMITH placed his hands behind his back CERT Officer DOE cuffed Plaintiff SMITH, turned him around, and yelled, in sum and substance, "Nigger, if you look at any of us you won't live to regret it."

109. CERT Officers then pushed Plaintiff SMITH face down onto his bed and began punching and kicking him.

110. During the assault, CERT Officers yelled, in sum and substance, "Keep your fucking head down you Jihadi nigger. This is how we treat you fucking terrorists."

111. Plaintiff SMITH is a practicing Muslim.

112. At approximately this time, Plaintiff SMITH, who is asthmatic, began experiencing difficulties breathing.

113. CERT Officers then began slapping Plaintiff SMITH's head and yelled, in sum and substance, "When you get up you better not look at us asshole."

114. CERT Officer DOES placed Plaintiff SMITH on his feet as they continued to punch and slap him in the face.

115. Two CERT Officers held Plaintiff SMITH up as a third CERT Officer grabbed his testicles and yelled, in sum and substance, "If you don't listen to us or if you look at us you will never be able to make any nigger babies. Understand?"

116. Plaintiff SMITH responded, "Yes."

117. A CERT Officer then yelled, in sum and substance, "I told you not to fucking talk" and resumed slapping Plaintiff SMITH in the head.

118. Plaintiff SMITH was dragged out of his cell by the handcuffs, causing extreme pain to his hands, wrists, arms, shoulders, and back.

119. CERT Officers then escorted Plaintiff SMITH toward to the Administrative Building.

120. Along the way CERT Officers ordered Plaintiff SMITH to keep his head down, while they punched him in the back and pushed him into walls.

121.    At one point, Plaintiff SMITH was in so much pain that he could no longer walk.

122.    The CERT Officers dragged him the remainder of the way to the Administrative Building.

123.    In the Administrative Building, Plaintiff SMITH was taken to a small room where he was strip searched, which included a body cavity search.

124.    Following the strip search Plaintiff SMITH was placed in mechanical full-body shackles.

125.    Plaintiff SMITH was then escorted into the Administrative Building's waiting area by CERT Officers who ordered him to sit on a bench and keep his head down.

126.    Plaintiff SMITH complied with the CERT Officers' orders.

*Luke Matthews*

127.    Also on June 16, 2015, CERT Officers approached Plaintiff MATTHEWS' cell and yelled, in sum and substance, "Get to your feet."

128.    Plaintiff MATTHEWS complied with their order.

129.    Two CERT Officers entered Plaintiff MATTHEWS' cell, pat frisked him, and handcuffed him behind his back.

130.    The CERT Officers ordered Plaintiff MATTHEWS to keep his head down and not to speak with anyone as they escorted him out of his cell.

131.    Plaintiff MATTHEWS complied with CERT Officers orders.

132.    As CERT Officers escorted Plaintiff MATTHEWS to Clinton's Administrative Building, they constantly threatened him with physical force if he raised his head.

133.    After Plaintiff MATTHEWS reached the Administrative Building, CERT Officers took him to a small room and conducted a strip search.

134.     Following the strip search, Plaintiff MATTHEWS was placed in mechanical, full body restraints.

135.     Plaintiff MATTHEWS was then taken outside the room he was strip searched and forced to kneel on a bench for a long period of time as the CERT Officers placed him in ankle restraints.

136.     CERT Officers then escorted Plaintiff MATTHEWS to the Administrative Building's waiting area where he was ordered to sit on a bench and keep his head down.

*Carlos Gomez*

137.     Also on June 16, 2015 CERT Officers entered Plaintiff GOMEZ's cell, grabbed him by his neck, and choked him, while placing him in handcuffs.

138.     Plaintiff GOMEZ was then forced outside his cell by CERT Officers, who told him, in sum and substance, "If you don't keep your head down, you'll lose your teeth."

139.     CERT Officers then escorted Plaintiff GOMEZ to the Administrative Building, during which time they pushed him into walls and punched him in his ribs.

140.     CERT Officers then strip searched Plaintiff GOMEZ in a small room in the Administrative Building and placed him in mechanical full body shackles.

141.     He was then taken to a bench, where he was ordered to balance himself on the bench's sharp ridges.

142.     CERT Officers told Plaintiff GOMEZ, in sum and substance, "If you fall off the bench we will stomp your face."

143.     Plaintiff GOMEZ experienced great pain as a result of balancing himself on the bench.

144.     Eventually, CERT Officers placed ankle shackles on Plaintiff GOMEZ and escorted him to a bench in the Administrative Building waiting area.

***Robert Negron***

145.     Also on June 16, 2015 CERT Officers stopped in front of Plaintiff NEGRON's cell and yelled, in sum and substance, "Stand up and turn around with hands behind your back."

146.     Plaintiff NEGRON complied with the CERT Officers order.

147.     CERT Officer DOES then entered Plaintiff NEGRON's cell, kicked him in the right hamstring and punched him in the back of his head, knocking him to the ground.

148.     CERT Officer DOES then picked up Plaintiff NEGRON, placed him in a kneeling position, pushed his torso onto his bed, while forcefully pushing his neck into the mattress, and handcuffed him

149.     While placing Plaintiff NEGRON in handcuffs one CERT Officer pulled his thumbs back with such force that Plaintiff NEGRON thought they were going to break.

150.     Throughout this process CERT Officers yelled out repeatedly "Stop resisting."

151.     After CERT Officers removed Plaintiff NEGRON from his cell they slammed him face first into a wall and pushed him down to his knees.

152.     CERT Officers then order Plaintiff NEGRON to crisscross his legs behind him.

153.     Plaintiff NEGRON could not comply with the order because of the pain he was experiencing as a result of the CERT Officers kicking his hamstring.

154.     CERT Officers then forcefully crisscrossed Plaintiff NEGRON's legs, causing him pain.

155.     One CERT Officer leaned into Plaintiff NEGRON's ear and yelled, in sum and substance "Keep your fucking head down, follow my instructions, and don't say a fucking word."

156. CERT Officers then lifted Plaintiff NEGRON to his feet, shoved his head down and forcefully held it in a painful position, as they escorted him out of the block.

157. Plaintiff NEGRON suffers from cervical and spinal stenosis, which was exasperated by the officers' actions that caused increased pain.

158. As CERT Officers transported Plaintiff NEGRON to the Administrative Building, they pushed him face first into a wall, pushed him to his knees, and again crisscrossed his legs.

159. CERT Officers then lifted Plaintiff NEGRON to his feet, as one CERT Officer yelled, in sum and substance, "Keep your fucking head down. I tell you again you're going down. You hear me? Are you fucking deaf?"

160. CERT Officers then escorted Plaintiff NERGRON to the Administrative Building.

161. In the Administrative Building Plaintiff NEGRON was taken to a small room where he was strip searched and placed in mechanical full-body shackles.

162. Plaintiff NEGRON was then escorted into the Administrative Buildings corridor by CERT Officers who ordered him to sit on a bench and keep his head down.

163. Plaintiff NEGRON complied with the CERT Officers orders.

*Holding Area*

164. Plaintiffs MATTHEWS, GOMEZ, SMITH, NEGRON and several other incarcerated people sat on benches in the waiting area, in mechanical, full body restraints, while CERT Officers walked by and verbally assaulted him.

165. One CERT Officer approached Plaintiff NEGRON and said, in sum and substance, "My officers have authority to use physical force if you lift your head."

166.     As Plaintiff MATTHEWS sat on the bench with his head down, a CERT Officer approached him and screamed into his ear, in sum and substance, "What the fuck are you looking at?"

167.     Another CERT Officer approached Plaintiff SMITH, poked him on the side of the head and yelled, in sum and substance, "You fucking Jihadi terrorist. I killed motherfuckers like you in Iraq."

168.     Plaintiff SMITH was slapped in the head by a CERT Officer who then said, in sum and substance, "I can kill you and dump your body out here and no one would find you."

169.     A couple minutes later, the same CERT Officer who approached Plaintiff MATTHEWS earlier returned and screamed in his ear, in sum and substance, "What the fuck are you looking at."

170.     Again, Plaintiff MATTHEWS continued to keep his head down as ordered and again did not respond to the CERT Officer.

171.     Plaintiff MATTHEWS was then approached by a second CERT Officer who grabbed him by his neck and began choking him.

172.     While the CERT Officer was choking Plaintiff MATTHEWS, he yelled, in sum and substance, "You don't know how to follow orders?"

173.     Plaintiff MATTHEWS nearly lost consciousness as the CERT Officer choked him.

174.     While continuing to choke Plaintiff MATTHEWS, the CERT Officer forced Plaintiff MATTHEWS' head between his legs. Because Plaintiff MATTHEWS was in full body mechanical restraints, this caused extreme pain to his neck and spine.

175.     CERT Officer DOE released Plaintiff MATTHEWS from the choke hold and yelled, in sum and substance, "You feel stupid now, don't know"

176.     CERT Officer DOE then forced Plaintiff MATTHEWS to stand up and walk down the waiting area corridor.

177.     CERT Officer DOE approached Plaintiff MATTHEWS and yelled, in sum and substance, "keep your fucking head down you big, stupid motherfucker."

178.     CERT Officer DOE had what appeared to be handcuffs wrapped around his fists and repeatedly punched Plaintiff MATTHEWS in the head, while yelling, in sum and substance "Keep your fucking head down."

179.     As blood ran down Plaintiff MATTHEWS' face, CERT Officers escorted him to a bus waiting outside the Administrative Building, pushing Plaintiff MATTHEWS into walls, radiators, and door frames along the way.

180.     Several of the CERT Officer who assaulted Plaintiff MATTHEWS in the Administrative Building's waiting area where wearing the following identification numbers: 44-3; 44-4; 44-23; and 44-55.

181.     After walking onto the bus, one CERT Officer yelled, in sum and substance, "Put this one in the front. He's special."

182.     Plaintiff MATTHEWS was thrown in the bus's front seat.

183.     After Plaintiff MATTHEWS was placed on the bus, two CERT Officers escorted Plaintiff GOMEZ toward the waiting area exit.

184.     CERT Officer DOE told Plaintiff GOMEZ, in sum and substance, "If you don't walk into the radiator, I'm going to kick your ass and knock out your teeth."

185.     Plaintiff GOMEZ, fearful for his safety, walked into the radiator resulting in lower body pain.

186.    As CERT Officer DOES escorted Plaintiff GOMEZ out of the building, they pulled on his restraints, causing excruciating pain to his hands, wrists, and arms.

187.    Plaintiff GOMEZ was escorted onto the bus and placed in a seat by two CERT Officers.

188.    Plaintiffs SMITH, NEGRON, and approximately six other incarcerated people were eventually escorted to the bus, with two CERT Officers assigned to each incarcerated person, and placed in seats.

189.    After CERT Officers placed each incarcerated person in their seat, the officers guarding Plaintiff MATTHEWS instructed the more than 15 CERT Officers to hit him as they exited the bus.

190.    Plaintiff MATTHEWS was repeatedly punched in the head and upper body by more than 15 CERT Officers as they exited the bus.

191.    Plaintiffs MATTHEWS, GOMEZ, SMITH, NEGRON and the other incarcerated people were taken to Upstate.

192.    After Plaintiff MATTHEWS was escorted off the bus at Upstate, he saw Corrections Officer Welch, whom he recognized.  Officer Welch told MATTHEWS, in sum and substance, "we have orders not to talk to any of the guys from Clinton."

193.    Upon information and belief, Defendant ROCK was aware of and/or gave these orders to the Upstate Corrections Officers.

194.    Plaintiff MATTHEWS was escorted to the medical area by a CERT Officer, who told him not to report his medical injuries to the Upstate medical staff.

195.    Plaintiff MATTHEWS, fearing for his safety, did not ask for medical attention at his initial meeting with the Upstate medical staff.

196.     After exiting the bus at Upstate, Plaintiff GOMEZ was told by a CERT Officer, in sum and substance, "We're going to take you in front of a nurse. You tell her you don't need to see a doctor."

197.     Plaintiff GOMEZ was taken to a nurse, who asked him several questions as the CERT Officer stood next to him.

198.     Fearful for his safety, Plaintiff GOMEZ told the nurse that he didn't need medical attention despite being in severe physical pain.

199.     While CERT Officers escorted Plaintiff SMITH into the facility, they said, in sum and substance, "if the nurse asks if you need to see the doctor, you tell them no."

200.     Fearful for his safety, Plaintiff SMITH told the nurse that he didn't need medical attention despite being in physical pain.

201.     After Plaintiff NEGRON stepped off the bus a CERT Officer whispered in his ear, in sum and substance, "You better not report any injuries to the nurse."

202.     Fearful for his safety, Plaintiff NEGRON complied with the CERT Officer's instructions and told the nurses that he did not need medical attention.

203.     After their superficial visits with the Upstate Medical Staff Plaintiffs MATTHEWS, GOMEZ, SMITH, NEGRON were placed in the Special Housing Unit ("SHU") without any privileges.

204.     As Plaintiffs GOMEZ, SMITH, and NEGRON were escorted to their cells they saw a paper stuck to their doors, reading, in sum and substance, "Clinton Guys. Do Not Talk To."

***Upstate Correctional Facility***

205.    At Upstate, after Plaintiffs were in SHU and free from the intimidation of CERT Officers, they repeated requests for medical attention for the injuries they sustained at Clinton were ignored.

206.    Plaintiff MATTHEWS, who is a type two diabetic, requested his diabetes medication approximately 24 hours after he arrived at Upstate.

207.    Plaintiff MATTHEWS was not given his medication the entire time he was at Upstate.

208.    Plaintiff GOMEZ, who suffers from scoliosis, was denied his medication for five days at Upstate and went through withdrawal.

209.    Plaintiff NEGRON, who suffers from arthritis, asthma, and cervical and spinal stenosis, did not receive his inhaler or aspirin for five days and was denied his arthritis medication his entire incarceration at Upstate.

210.    At Upstate, Plaintiffs MATTHEWS, GOMEZ, BONDS, SMITH, CHAVES, and NEGRON were interviewed by OSI and NYSP officers about their knowledge of the escape.

211.    Plaintiffs MATTHEWS, GOMEZ, BONDS, SMITH, CHAVES, and NEGRON all stated that they knew nothing about the escape, which is the truth.

212.    Plaintiffs MATTHEWS, GOMEZ, BONDS, and SMITH described to the OSI Officers how they were assaulted by CERT Officers and received no medical attention.

213.    OSI Officer Facto and NYSP Officer Fish noticed the physical injures Plaintiff MATTHEWS sustained, inquired about them, but ultimately did nothing to help.

214.    The OSI Officers ignored Plaintiffs MATTHEWS, GOMEZ, BONDS, and SMITH's complaints about their injuries and the conduct of the Clinton Corrections Officers, NYSP Officer, and CERT Officers.

215. Plaintiff MATTHEWS was held in SHU for approximately ten days.

216. Plaintiff GOMEZ was held in SHU for approximately eight days.

217. Plaintiff BONDS was held in SHU for approximately ten days.

218. Plaintiff SMITH was held in SHU for approximately thirteen days,

219. Plaintiff CHAVES was held in SHU for approximately seven days.

220. Plaintiff NEGRON was held in SHU for approximately thirteen days.

***Sullivan Correctional Facility***

221. Plaintiff GOMEZ was transferred to Sullivan on or about June 22, 2015,

222. Plaintiff BONDS was transferred to Sullivan on or about June 25, 2016.

223. Plaintiff MATTHEWS was transferred to Sullivan on or about June 28, 2015.

224. Plaintiffs CHAVES, NEGRON, and SMITH were transferred to Sullivan on or about June 29, 2016.

225. At Sullivan, Plaintiff GOMEZ saw a doctor for his psychological and emotional injuries and the doctor prescribed antidepressants.

226. Plaintiff GOMEZ never received his medication.

227. Plaintiff GOMEZ made numerous inquiries to Sullivan nurses regarding his prescription.

228. In response to Plaintiff GOMEZ's inquires, one nurse told him, in sum and substance, "Man up. You've been in jail a long time. You'll get over it."

229. Upon arriving at Sullivan, Plaintiff MATTHEWS was informed by members of the medical staff that his diabetic nerve pain medication would be served to him in a crushed powder.

230. Plaintiff MATTHEWS' medication was not previously served to him in this manner and this method of consumption is not recommended by the medicine's manufacturer.

231.    As a result of taking crushed medication, Plaintiff MATTHEWS experienced stomach pain and nausea.

232.    Plaintiff MATTHEWS' sick call requests for the injuries he sustained at Clinton were repeatedly denied by members of the Sullivan medical staff.

233.    On July 29, 2015, Plaintiff MATTHEWS met with Sullivan Mental Health Specialist Defendant YILDIZ.

234.    Plaintiff MATTHEWS described the mental health issues he was suffering from stemming from his assault at Clinton and his confinement at Upstate.

235.    At this meeting Defendant YILDIZ told Plaintiff MATTHEWS, in sum and substance, "What you described at Clinton never happened. The CERT team was never deployed to that facility, and you were never transferred to Upstate."

236.    When Plaintiff MATTHEWS asked Defendant YILDIZ how he ended up at Sullivan, YILDIZ responded, in sum and substance "You were a regular transfer."

237.    In disbelief, Plaintiff MATTHEWS responded, in sum and substance, "What I told you about Clinton never happened?"

238.    Defendant YILDIZ responded, in sum and substance, "No. Am I supposed to believe whatever the patient tells me?"

239.    At Sullivan, Plaintiff MATTHEWS has been denied adequate medical attention for the injuries that he sustained at Clinton, specifically, permanent partial hearing loss, the injuries to his neck and back, and the psychological and emotional injuries he continues to suffer.

240.    As early as September 2015, doctors, including Dr. Wladyslaw Sidorowicz, recommended that Plaintiff MATTHEWS receive an MRI for the injuries to his neck and back that he sustained at Clinton, but the MRI was not conducted until May 2016.

241.     As a result of the denial of proper medical treatment, Plaintiff MATTHEWS has experienced unnecessary extreme pain and suffering.

*Aftermath*

242.     Plaintiff MATTHEWS has still not received adequate medical attention for the injuries he sustained as a result of Defendants' handling of the investigation into the Clinton escape. He suffered from and continues to suffer from injures to his face, head, neck, right arm, back, and legs. Plaintiff MATTHEWS has limited motion and extreme pain in his neck and back. He has permanent scaring on his face and right arm from the injuries he sustained at Clinton. Plaintiff MATTHEWS continues to experience neck and back pain and has lost hearing in both ears as a result of being repeatedly punched in the head. Plaintiff MATTHEWS also suffers from mental health issues, including, but not limited to anxiety, depression, insomnia, nightmares, and post-traumatic stress disorder. He is currently taking psychotropic medication for nightmares, anxiety, and depression.

243.     Plaintiff GOMEZ has still not received adequate medical attention for the injuries he sustained as a result of Defendants' handling of the investigation into the Clinton escape. He suffered from and continues to suffer from injures to his neck, nerve damage, and injuries to his left knee. He also suffers from mental health issues, including, but not limited to insomnia, nightmares, flashbacks, and depression.

244.     Plaintiff BONDS has still not received adequate medical attention for the injuries he sustained as a result of Defendants' handling of the investigation into the Clinton escape. He suffered from and continues to suffer from injures to his face, head, neck, throat, and back. Plaintiff BONDS also suffers from mental health issues, including, but not limited to mental anguish and fear.

245. Plaintiff SMITH has still not received adequate medical attention for the injuries he sustained as a result of Defendants' handling of the investigation into the Clinton escape. He suffered from and continues to suffer from back pain. Plaintiff SMITH also suffers from mental health issues, including, but not limited to mental anguish and fear.

246. Plaintiff CHAVES has still not received adequate medical attention for the injuries he sustained as a result of Defendants' handling of the investigation into the Clinton escape. He suffered from and continues to suffer mental health issues, including, but not limited to mental anguish and fear.

**FIRST CAUSE OF ACTION**
**42 U.S.C. § 1983 – Individual Defendants Violations of**
**Plaintiffs' Eighth and Fourteenth Amendment Rights**

247. Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

248. The acts of Defendants CLINTON CORRECTIONS OFFICERS, UPSTATE CORRECTIONS OFFICERS, OSI OFFICERS, NYSP OFFICERS, CERT OFFICERS, UPSTATE CORRECTIONAL FACILITY MEDICAL OFFICIALS, and SULLIVAN CORRECTIONAL FACILITY MEDICAL OFFICIALS constituted conduct under color of state law which deprived Plaintiffs of rights, privileges, and immunities secured by the Constitution and laws of the United States.

249. As a direct and proximate result of the conduct alleged herein, Defendants CLINTON CORRECTIONS OFFICERS, UPSTATE CORRECTIONS OFFICERS, OSI OFFICERS, NYSP OFFICERS, CERT OFFICERS, UPSTATE CORRECTIONAL FACILITY MEDICAL OFFICIALS, and SULLIVAN CORRECTIONAL FACILITY MEDICAL

OFFICIALS deprived Plaintiffs of the following clearly established rights under the Eighth, and Fourteenth Amendments of the United States Constitution, more specifically:

a. the right to be free from the use of excessive and unreasonable force and seizure;

b. the right to be free from cruel and unusual punishment;

c. the right to be free from deprivation of liberty without due process of law; and

d. the right to equal protection under the law.

250. In committing the acts and omissions complained of herein, Defendants CLINTON CORRECTIONS OFFICERS, UPSTATE CORRECTIONS OFFICERS, OSI OFFICERS, NYSP OFFICERS, CERT OFFICERS, UPSTATE CORRECTIONAL FACILITY MEDICAL OFFICIALS, and SULLIVAN CORRECTIONAL FACILITY MEDICAL OFFICIALS breached their affirmative duty to intervene to protect the constitutional rights of Plaintiffs from infringement by other law enforcement officers in their presence.

251. As a direct and proximate result of Defendants CLINTON CORRECTIONS OFFICERS, UPSTATE CORRECTIONS OFFICERS, OSI OFFICERS, NYSP OFFICERS, CERT OFFICERS, UPSTATE CORRECTIONAL FACILITY MEDICAL OFFICIALS, and SULLIVAN CORRECTIONAL FACILITY MEDICAL OFFICIALS deprivation of Plaintiffs' constitutional rights, Plaintiffs suffered the injuries and damages set forth above.

252. The unlawful conduct of Defendants CLINTON CORRECTIONS OFFICERS, UPSTATE CORRECTIONS OFFICERS, OSI OFFICERS, NYSP OFFICERS, CERT OFFICERS, UPSTATE CORRECTIONAL FACILITY MEDICAL OFFICIALS, and SULLIVAN CORRECTIONAL FACILITY MEDICAL OFFICIALS was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

**SECOND CAUSE OF ACTION**
**Violations of the New York State Constitution**

253.     Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

254.     Such conduct breached the protections guaranteed to Plaintiff by the New York State Constitution, including but not limited to Article 1, §§ 1, 11 and 12, and including the following rights:

a.  freedom from false imprisonment, that being wrongfully detained without good faith, reasonable suspicion, or legal justification, and of which wrongful detention plaintiff was aware and did not consent;

b.  freedom from discrimination based on race, color, creed or religion; and

c.  freedom from deprivation of liberty without due process of law.

255.     As a direct and proximate result of Defendants CLINTON CORRECTIONS OFFICERS, UPSTATE CORRECTIONS OFFICERS, OSI OFFICERS, NYSP OFFICERS, CERT OFFICERS, UPSTATE CORRECTIONAL FACILITY MEDICAL OFFICIALS, and SULLIVAN CORRECTIONAL FACILITY MEDICAL OFFICIALS deprivations of Plaintiffs' rights, privileges, and immunities guaranteed by the New York State Constitution, Plaintiffs suffered the injuries and damages set forth above.

**THIRD CAUSE OF ACTION**
**(Title VI of the Civil Rights Act of 1964 Against DOCCS)**

256.     Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

257.     The acts and conduct of Defendants DOCCS, CLINTON CORRECTIONS OFFICERS, OSI OFFICERS, NYSP OFFICERS, and CERT OFFICERS complained of herein were motivated by racial animus, and were intended to discriminate on the basis of race.

258. Defendants DOCCS, CLINTON CORRECTIONS OFFICERS, OSI OFFICERS, NYSP OFFICERS, and CERT OFFICERS committed the foregoing acts intentionally, willfully, wantonly, maliciously, and/or with such reckless disregard of consequences as to reveal a conscious indifferent to the clear risk of death or serious injury to Plaintiffs that shocks the conscience. They are therefore also liable for punitive damages.

### FOURTH CAUSE OF ACTION
### (Title II of the ADA and the Rehabilitation Act)

259. Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

260. Pursuant to the Settlement Agreement achieved in *Disability Advocates, Inc. v. New York State Office of Mental Health*, New York State and its agencies agreed to commit to "a heightened level of care for all inmates with serious mental illnesses" and also "provides for additional treatment modalities and benefits for persons with mental illness in the State's correctional system." *See* Private Settlement Agreement, *Disability Advocates, Inc. v. New York State Office of Mental Health*, 02-cv-4002 (GEL) (Dkt. No. 94), at 2.

261. Defendants DOCCS, OMH, OSMAN YILDIZ, OMH MEDICAL PROFESSIONALS and SULLIVAN CORRECTIONAL FACILITY MEDICAL OFFICIALS knew that Plaintiffs experienced extreme psychological and emotion trauma as a result of their treatment as a result of Defendants' handling of the investigation into the Clinton escape. Rather than accommodating Plaintiffs' mental health issues, Defendants violated Plaintiffs' rights under Title II of the ADA and Section 504 by depriving and excluding Plaintiffs of OMH services as well as medications diagnosed to address their psychological and emotional issues.

262. SULLIVAN MEDICAL PROFESSIONALS have failed to provide adequate services, including the denial of mental health services and refusal to distribute diagnosed medication to Plaintiff GOMEZ.

263. Defendants' failure to accommodate Plaintiffs' mental health issues is the proximate cause of their ongoing psychological and emotional injuries.

**FIFTH CAUSE OF ACTION**
**Assault and Battery**

264. Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

265. Defendants CERT OFFICERS, CLINTON CORRECTIONS OFFICERS, OSI OFFICERS, and NYSP OFFICERS without just cause, wilfully and maliciously used physical force against Plaintiffs causing them injuries.

266. Defendant CERT OFFICERS, CLINTON CORRECTIONS OFFICERS, OSI OFFICERS, and NYSP OFFICERS committed the foregoing acts intentionally, wilfully, and with malicious disregard for Plaintiffs' rights, and are therefore liable for punitive damages.

**SIXTH CAUSE OF ACTION**
**Intentional Infliction of Emotional Distress**

267. Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

268. Defendants, through the foregoing acts, did commit extreme and outrageous conduct and thereby intentionally, and/or recklessly caused Plaintiff to experience severe mental and emotional distress, pain, suffering, and damage to name and reputation.

269. Defendants committed the foregoing acts intentionally, willfully, and with malicious disregard for Plaintiffs' rights and are therefore liable for punitive damages.

## SEVENTH CAUSE OF ACTION
### Negligence

270. Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

271. Defendants owed plaintiffs a duty of care, including the duty to exercise due care in the course of their duties and the duty to protect incarcerated people from the intentional misconduct of other DOCCS officers.

272. Defendants, through the foregoing acts, negligently failed to use due care in the performance of their duties in that they failed to perform their duties with the degree of care that a reasonably prudent and careful officer would have used under similar circumstances.

273. All of these acts were performed without any negligence on the part of Plaintiffs and were the proximate cause of the injuries to Plaintiffs.

## EIGHTH CAUSE OF ACTION
### Negligent Infliction of Emotional Distress

274. Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

275. As Government officials acting in the performance of their duties, Defendants have a duty of care.

276. In breach of that duty, Defendants endangered Plaintiffs' safety and caused them to fear for their safety.

277. As a result, Plaintiffs suffered emotional distress.

## NINETH CAUSE OF ACTION
### *Respondeat Superior*

278. Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

279.    At all relevant times, Defendants Officers were employees of DOCCS and/or OMH and were acting within the scope of their employment.

280.    Defendants CUOMO, ROCK, DOCCS and/or OMH are therefore vicariously liable under the doctrine of r*espondeat superior* for the actions of Defendants Officers set forth herein.

## DEMAND FOR RELIEF

**WHEREFORE**, Plaintiffs demand the following relief against the Defendants, jointly and severally:

(a)    compensatory damages in an amount just and reasonable and in conformity with the evidence at trial;

(b)    punitive damages to the extent allowable by law;

(c)    attorneys' fees;

(d)    the costs and disbursements of this action;

(e)    interest;

(f)    such other and further relief as the Court deems just and proper.

Dated: New York, NY
June 6, 2016

BELDOCK LEVINE & HOFFMAN LLP
99 Park Avenue, PH/ 26th Fl.
New York, New York 10016
(212) 490-0400


By: /s/_____
Jonathan C. Moore
Joshua S. Moskovitz
Keith M. Szczepanski

*Attorneys for Plaintiffs Luke Matthews,*
*Carlos Gomez, Gentl Bonds, Robert Smith,*
*Robert Negron, and Kasiem Chaves*