UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
─────────────────────────────────────────────

LUKE MATTHEWS, CARLOS GOMEZ, GENTL BONDS,
ROBERT SMITH, and KASIEM CHAVES,

                                    Plaintiffs,[1]

        v.                                                          9:17-cv-503

NEW YORK STATE DEPARTMENT OF CORRECTIONS
AND COMMUNITY SUPERVISION ("DOCCS");
CLINTON CORRECTIONS SERGEANT SWEENEY;
CLINTON CORRECTIONS SERGEANT GUYNUP;
CORRECTIONAL EMERGENCY RESPONSE TEAM ("CERT")
OFFICER 44-29; CERT OFFICER 44-23; CERT OFFICER 44-5;
CERT OFFICER 44-4; and CERT OFFICER 44-3,

                                    Defendants
─────────────────────────────────────────────

THOMAS J. McAVOY,
Senior United States District Judge

## DECISION & ORDER

## I.      INTRODUCTION

        Plaintiffs Luke Matthews, Carlos Gomez, Gentl Bonds, Robert Smith, and

Kasiem Chaves were at pertinent times prisoners under the custody of the New York

State Department of Corrections and Community Supervision ("DOCCS").  Their claims

stem from incidents that occurred after DOCCS officials learned on June 6, 2015 that

Inmates Richard Matt and David Sweat escaped from the Clinton Correctional Facility

─────────────────────

[1] The Third Amended Complaint ("TAC"), which is the operative pleading, also includes Robert Negron as
a plaintiff. *See* Dkt. No. 298.  However, after the TAC was filed, the parties entered a stipulation of
dismissal of the claims brought by Mr. Negron. *See* Dkt. No. 307.

("Clinton").  At the time of the escape, Plaintiffs were incarcerated at Clinton.  Following the escape, Plaintiffs and other prisoners were interviewed by various DOCCS officials regarding the escape, and Plaintiffs and other prisoners were then transferred to Upstate Correctional Facility ("Upstate").  Plaintiffs' remaining claims arise in connection with Defendants' alleged actions or inactions during these interviews and their transfers to Upstate.  As explained below, Plaintiffs' transfers to Upstate were effectuated by DOCCS Correction Emergency Response Team ("CERT") officers from Eastern Correctional Facility through a procedure referred to as a draft.  *See* Pl. Exh. 9, 44-3 Dep. at 22:12-14.

Defendants filed a motion for summary judgment seeking to dismiss this action in its entirety.  *See* Dkt. No. 308.  Plaintiffs filed a "Motion for Leave to File Redacted Copies of Documents and Declassify Documents Marked 'Confidential' and 'Attorney's Eyes Only'" ("Motion to Seal and Declassify Documents"), *see* Dkt. Nos. 318, 318-1, 318-2, opposition to Defendants' summary judgment motion, and a cross-motion seeking spoliation sanctions.  *See* Dkt. No. 318-4 ("Combined Memorandum of Law"). Defendants filed a response to Plaintiffs' Motion to Seal and Declassify Documents, Dkt. No. 323, and a memorandum of law in opposition to Plaintiffs' cross-motion for spoliation sanctions and in further support of their summary judgment motion. Dkt. No. 326.  Plaintiffs filed a reply memorandum of law in further support of their cross-motion for spoliation sanctions. Dkt. No. 328.  The Court addresses the pending motions below.

## II.    PROCEDURAL BACKGROUND

The Court presumes familiarity with the procedural history of this case. Suffice it to say that after extensive motion practice, the Third Amended Complaint ("TAC") is the operative pleading. *See* Dkt. No. 298. The remaining claims are Plaintiffs' Section 1983 claims asserting Eighth Amendment excessive force and failure to intervene, Plaintiff Smith's Fourteenth Amendment claim asserting a violation of equal protection, *see* TAC §§ 198-203, and Plaintiff Smith's claim pursuant to Title VI of the Civil Rights Act of 1964 against DOCCS asserting that officers' actions were motivated by racial animus and intended to discriminate based on race. *See id.* at ¶¶ 204-206.

## III.   DISCUSSION

### a.  Plaintiffs' Motion to Seal and Declassify Documents

The parties entered into a protective order on April 24, 2018 that was so-ordered by the Court. Dkt. No. 61.  The protective order deals with the disclosure of material designated as "CONFIDENTIAL/ ATTORNEYS' EYES ONLY" that "counsel believes in good faith consists of (1) personnel or employment records; (2) medical information which is protected from disclosure by statute; or (3) information that could jeopardize institutional or inmate safety and security."  *Id.*, ¶ 2; *see id.* ¶ 9.[2]  Paragraph 13 provides that the Court "retains discretion whether to afford confidential treatment to any

---

[2] Paragraph 9 provides:

> If any CONFIDENTIAL information or material which is disclosed pursuant to this Order is offered into evidence or otherwise disclosed at the trial of this action, the parties hereby jointly request that any portion of the trial transcript reflecting such confidential information and any documents received into evidence containing such confidential information shall be made a sealed record until further Order of the Court. In any event, unless counsel agree otherwise, any pages of deposition testimony reflecting confidential information will be treated by the parties as confidential information under this Order.

confidential document or information contained in any confidential document submitted to the Court in connection with any motion, application, or proceeding that may result in an order or decision by the Court." *Id*. ¶ 13.

By order dated October 19, 2018, the CERT defendants were granted permission to proceed in this action using their badge numbers rather than their real names. Dkt. No. 138.  In reaching this conclusion, Magistrate Judge Peebles examined the ten, non-exhaustive factors set forth in *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 190 (2d Cir. 2008) and found that the factors weighed in favor of permitting the CERT defendants to proceed accordingly.  *See id.* at 6-18.[3]

Defendants represent that after prolonged and contentious discovery before Magistrate Judge Lovric, Defendants disclosed at least 5,893 bates-numbered pages of documents, many of them disclosed under the protective order. Dkt. No. 323 at 2. Defendants assert that when they filed their summary judgment motion, they filed exhibits under seal using the "Medical Records Filed" feature available on the Court's case management and electronic case files system (CM/ECF) to comply with the

---

[3] Judge Peebles found that factors weighing in favor of granting the motion included that: the nature of the defendant CERT Officers' employment with DOCCS, by which they are members of teams having specialized tactical training enabling them to respond to "the most dangerous and life-threatening situations in DOCCS prisons," including riots and escapes, is dangerous and highly sensitive; given the CERT Officers' duties, they could be subject to retaliatory actions both by prisoners and others outside the prison; the nature of their responses to situations in the prisons requires CERT Officers to remain covert at all times, and thus anonymity is critical to their ability to effectively and safely perform their jobs; because of the nature of their employment, CERT Officers are vulnerable to risks not typically assumed by other DOCCS correctional officers; plaintiffs would not be prejudiced by the anonymity of the defendant CERT Officers because their specific identities had already been disclosed to Plaintiffs' counsel under the protective order; despite the highly-publicized nature of the escapes, the identities of the defendant CERT Officers have not been divulged or released by Plaintiffs or any news organizations; while the prison escapes that ultimately led to the events spawning this lawsuit garnered intense local, state, and national media attention, that scrutiny does not outweigh the overarching public safety concern asserted by Defendants; and there are no other mechanisms that could be implemented to protect the defendant CERT Officers' identities.  Dkt. No. 138, at 6-18.

protective order.  *Id.*  Plaintiffs seek permission to file documents related to their cross-motion for spoliation sanctions and in opposition to Defendants' summary judgment motion redacted in whole or in part, and to modify (or "declassify") certain portions of documents otherwise covered by the protective order, the order allowing the CERT defendants to proceed using only their badge numbers, or impacting third-party privacy concerns.  *See* Dkt. No. 318-2 ("Exhibit B to Plaintiffs' Motion to Seal and/or Declassify").

## Analysis

"The 'notion that the public should have access to the proceedings and documents of courts is integral to our system of government.'" *United States v. Cohen*, 366 F. Supp. 3d 612, 618 (S.D.N.Y. 2019) (quoting *United States v. Erie County*, 763 F.3d 235, 238–39 (2d Cir. 2014)).  "Accordingly, there is a presumptive right of access to judicial documents rooted in both common law and the First Amendment." *In re Search Warrant Dated Nov. 5, 2021*, No. 21-MISC-813 (ATSLC), 2021 WL 5830728, at *2 (S.D.N.Y. Dec. 7, 2021)(citing *Erie County*, 763 F.3d at 238–39).

> Under Second Circuit precedent, documents may be sealed in whole or in part where it "is essential to preserve higher values and is narrowly tailored to serve that interest." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 120 (2d Cir. 2006) (quoting *In re New York Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987)). The "decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 599 (1978).
>
> Within the Second Circuit, courts follow a three-step process for determining whether documents should be sealed in whole or in part. First, the Court must determine whether the item at issue is a "judicial document," that is, whether the item is "'relevant to the performance of the judicial function and useful in the judicial process.'" *Lugosch*, 435 F.3d at

> 119 (quoting *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995)
> ("*Amodeo I*")).  Second, the Court "must determine the weight of that
> presumption [of access]," which is "governed by the role of the material at
> issue in the exercise of Article III judicial power and the resultant value of
> such information to those monitoring the federal courts." *Id.* at 119.  Third,
> the Court must "balance competing considerations against" the weight of
> the presumption. *Id.* at 120.

*Id.*

All documents addressed by Plaintiffs' Motion to Seal and Declassify Documents are submitted in opposition to Defendants' motion for summary judgment, or in support of Plaintiffs' cross-motion for spoliation sanctions.  "[D]ocuments submitted to a court for its consideration in a summary judgment motion are – as a matter of law – judicial documents to which a strong presumption of access attaches, under both the common law and the First Amendment." *Lugosch*, 435 F.3d at 121.  The same conclusion applies to documents submitted in connection with Plaintiffs' motion for spoliation sanctions.  These documents are relevant to the performance of the judicial function and useful in the judicial process.  Thus, all documents addressed in Plaintiffs' Motion to Seal and Declassify Documents are judicial documents to which the presumption of public access applies.

"The general and deeply rooted rule is that the presumptive right of access is afforded 'strong weight' when applied to documents that play a central role in 'determining litigants' substantive rights—conduct at the heart of Article III.'" *Mirlis v. Greer*, 952 F.3d 51, 60 (2d Cir. 2020) (quoting *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995) ("*Amodeo II*")).  "Summary judgment filings should not remain under seal 'absent the most compelling reason' or 'absent exceptional circumstances'

6

because the act of formal adjudication should be subject to public scrutiny." *Monahan v. City of New York*, No. 20-CV-2610 (PKC), 2022 WL 993571, at *1 (S.D.N.Y. Mar. 30, 2022)(quoting *Lugosch*, 435 F.3d at 121).  The same conclusion is reached for the filings made in connection with Plaintiffs' motion for spoilation sanctions.

Next, the Court must identify and weigh factors "that legitimately counsel" against public access. *Mirlis*, 952 F.3d at 59.  "Sealing or redaction is warranted if the privacy interests of the party resisting disclosure outweigh the presumption of access." *Monahan*, 2022 WL 993571, at *1 (citing *Mirlis*, 952 F.3d at 59); *see In re Search Warrant Dated Nov. 5, 2021*, 2021 WL 5830728, at *4 ("In the third step, a court 'must balance competing considerations' against the presumption of public access.")(quoting *Amodeo II*, 71 F.3d at 1050).  "It is the burden of the party seeking to overcome the presumption of access to demonstrate the need to keep the materials under seal.*" Hillary v. Vill. of Potsdam*, No. 7:12-CV-1669 GLS/DEP, 2015 WL 902930, at *2 (N.D.N.Y. Mar. 3, 2015)(citing *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 826 (2d Cir.1997)); *see* N.D.N.Y. L.R. 5.3(a)("A party seeking to have a document, a portion of a document, a party or an entire case sealed bears the burden of filing an application setting forth the reason(s) that the referenced material should be sealed under the governing legal standard.").

The Court agrees with Judge Peebles' conclusion that the CERT defendants' identities should remain sealed in the pertinent public filings to protect the CERT defendants, CERT operations, and DOCCS institutional security.  This information constitutes higher values that outweigh the public's presumptive right of access to

7

judicial documents containing this information.  Thus, to the extent Plaintiffs seek to file documents that redact the CERT defendants' identities, the motion is granted.

The Court also finds that shielding the particulars of DOCCS' tactical response to the escape of the two inmates from Clinton and the workings of CERT operations is necessary to protect the safety and security of DOCCS correctional facilities and the general public.  The value of this information to institutional functions and safety outweighs the public's presumptive right of access to judicial documents that contain this information. Thus, to the extent Plaintiffs seek to file documents that redact this information, the motion is granted.

In addition, the Court finds that the privacy interests of nonparty incarcerated individuals, who Plaintiffs described as "nonparty inmate witnesses," present a higher value outweighing the public's presumptive right of access to this information in judicial documents.  *See, e.g., U.S. Sec. & Exch. Comm'n v. Ahmed*, No. 3:15-cv-675 (JBA), 2018 WL 4266079, at *3 (D. Conn. Sept. 6, 2008) (finding that non-party's confidentiality interest "substantially outweigh[ed] the public's right of access" and granting motion to seal).  These nonparty inmate witnesses may be subject to retaliation if their identities are revealed in the papers.  Further, having reviewed Plaintiffs' spoilation sanctions motion and their opposition to Defendants' summary judgment motion, the identities of the nonparty inmate witnesses in the relevant documents is not critical to the Court's decisions.  The Court's reference to the nonparty inmate witnesses' statements and documents from which the statements are found will allow the public to understand the bases for the Court's decisions without disclosing the nonparty inmate witnesses'

8

identities.  Thus, to the extent Plaintiffs seek to file documents that redact this information, the motion is granted.

Turning to Plaintiffs' Combined Memorandum of Law, the Court finds that the document is properly redacted as Plaintiffs propose. That is, pages 3 and 7 may be redacted as to the names of non-party witnesses, and pages 6 and 31 may be redacted as to "information CERT Lieutenant Michael Harms stated at his deposition was confidential law enforcement technique information."  Dkt. No. 318-2, at 1.  Thus, the motion in this regard is granted.

Because the parties seek to continue to seal certain documents in toto, and because Defendants oppose Plaintiffs' requests to unseal parts of documents that are currently sealed in whole or in part, the Court must determine whether some lesser manner of sealing than currently exists could be narrowly tailored to preserve the common law and the First Amendment presumption of public access to judicial documents while at the same time protecting sensitive information. The existence of the protective order, by itself, is not enough for sealing. *See Lugosch*, 435 F.3d at 125–26 (holding that the fact that a protective order was in place during discovery, and that defendants claimed they would not have voluntarily disclosed documents without a protective order, is not dispositive as to whether documents central to a summary judgment motion should be sealed); *Seaman v. Nat'l Collegiate Student Loan Tr. 2007-2*, No. 18-CV-1781 (PGG/BCM), 2022 WL 715241, at *1 (S.D.N.Y. Mar. 10, 2022)("[I]t is well-settled that 'the mere existence of a confidentiality order' does not justify a sealing order.")(quoting *Lugosch*, 435 F.2d at 126); *Scism v. City of Schenectady*, No. 1:18-CV-

9

672 (TWD), 2021 WL 4458819, at *4 (N.D.N.Y. Sept. 29, 2021)("[T]he existence of a

protective order has no bearing on whether a Court may order a document sealed from

public access under *Lugosch*."), *aff'd sub nom., Scism v. Ferris*, No. 21-2622-CV, 2022

WL 289314 (2d Cir. Feb. 1, 2022).  However, a reason for the protective order - namely,

to provide Plaintiffs with sensitive information without compromising DOCCS'

institutional security or technical methods for conducting investigations into serious

matters in the prisons - impacts whether continued sealing of this information is

essential to preserving higher values and to the balance of competing interests.  The

Court finds that the protection of this sensitive information which, if publicly disclosed,

could jeopardize institutional security and the welfare of CERT officers, constitutes

higher values that outweigh the presumptive right of access to judicial documents that

contain this information.  However, the wholesale sealing of deposition excerpts is not

narrowly tailored to protect these higher values.  Counsel for the parties are directed to

confer and, within three (3) weeks of this Decision and Order, jointly propose redactions

to deposition excerpts (Pl. Exhs. 1, 3, 9, 11, 12, 13, 14, 16, 17, & 23) that do not reveal

the CERT officers' identities, confidential law enforcement technique information, or the

identities of non-party incarcerated witnesses.  The Court will proceed with the other

pending motions and, in doing so, will only reference information from Plaintiffs' exhibits

that does not disclose Defendant CERT officers' identities, overt confidential law

enforcement technique information, or identities of nonparty inmate witnesses.

　　　To the extent Defendants contend material concerning internal investigations

about allegations of force by incarcerated individuals who were interviewed by DOCCS

officials regarding the escape and transferred to Upstate at the relevant time should be sealed, Defendants bear the burden of overcoming the presumption of access to this material. *See Hillary*, 2015 WL 902930, at *2. This material is relevant to Plaintiffs' spoliation argument. Defendants have not adequately overcome the presumption of access to this material. Thus, Plaintiffs' Exhibits 4 ("OSI Inmate Interview Statements of nonparty inmate witnesses") and 27 ("OSI Investigative Reports on nonparty inmate witnesses marked confidential by Defendants") may be filed but redacted as to information identifying nonparty inmate witnesses. However, Plaintiffs' proposed redactions of these documents do not appear complete.[4] Counsel are directed to confer and, within three (3) weeks of this Decision and Order, jointly propose redactions to Plaintiffs' Exhibits 4 and 27 that remove information identifying nonparty inmate witnesses.

The Court finds that Plaintiffs' Exhibit 2, a 1-page CIU Interview Sheet containing the names of nonparty inmate witnesses and information obtained during the escape investigation; Exhibit 8, a 3-page CERT Deployment Report containing law enforcement information; Exhibit 10, a 1-page CERT team deployment roster identifying names of CERT team members; Exhibit 15, excerpts from the CERT training manual containing confidential law enforcement techniques; and Exhibit 18, excepts from the Clinton cell block A logbook identifying nonparty inmate information and law enforcement

---

[4] Plaintiffs' revised Exhibit 4 emailed to the Court Clerk and defense counsel contains no proposed redactions, and the proposed redaction of Exhibit 27 contains on page 3 a photograph of a nonparty incarcerated individual without a red box around the picture. Also, the originally redacted version of Exhibit 27 and the proposed redaction contain unredacted references to incarcerated individuals other than plaintiffs. Counsel should confer and determine whether unredacted reference to these other individuals was intentional and whether the jointly agreed upon redacted version of this document should contain these references.

techniques, contain sensitive information that outweighs the public's presumptive right of access to these documents.  Further, the Court finds that a lesser manner of sealing than currently exists cannot be narrowly tailored to preserve the common law and the First Amendment presumption of public access to judicial documents while at the same time protecting sensitive information.  Thus, Plaintiffs' motion to file these documents under seal is granted.

### b.  Defendants' Summary Judgment Motion

#### 1.  Plaintiff Smith's Equal Protection and Title VI Claims.

In response to Defendants' summary judgment motion, Plaintiff Smith indicates that he withdraws his Equal Protection and Title VI claims.  Dkt. No. 318-4, at 35. Accordingly, Defendants' motion in this regard is granted and these claims are dismissed with prejudice.

#### 2.  Plaintiffs Chaves' and Matthews' Eighth Amendment Claims Based on Kneeling

Defendants seek summary judgment on Plaintiffs Chaves' and Matthews' excessive force claims in which they claim they were forced to balance on their knees or shins for extended periods on the edge of a bench or the ridge of a hard plastic chair. *See* Def. Mem. at 11-14; TAC ¶¶ 64-66; *id*. ¶¶ 124-25.  Defendants contend that these claims should be dismissed because Plaintiffs fail to satisfy the objective and subjective prongs for such claims.  Def. Mem. at 11-14.  Although Plaintiffs oppose dismissal of these claims on this theory, the claims are encompassed in Defendants' argument that summary judgment is appropriate because there is no reliable evidence that any of the named defendants were personally involved in the alleged constitutional violations.

12

Inasmuch as Plaintiffs argue that any lack of reliable evidence of Defendants' personal involvement is the result of Defendants' spoliation of evidence, the Court will reserve decision on this issue until it resolves Plaintiffs' cross-motion for spoliation sanctions.

### 3.  Kicking Chaves' Leg

Defendants argue that "Chaves' additional allegation of being kicked once in the leg by a CERT officer should be rejected because he has never added it to his pleading," and "the single kick to keep Chaves' legs uncrossed (presumably for shackling), is a type of force that courts have held to be *de minimis*."  Dkt. No. 308-1 at 12 (citations omitted). Further, Defendants argue, Chaves did not describe any pain he experienced due to the kick or its severity, and he walked unassisted shortly after the kick. *Id*. at 13.

Plaintiffs do not respond to this argument.  Accordingly, this aspect of the motion is granted as unopposed and because the use of force was *de minimis*. See *Wright v. Goord*, 554 F.3d 255, 269 (2d Cir. 2009)("[T]he Eighth Amendment's prohibition against cruel and unusual punishment does not extend to '*de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind.'") (quoting *Hudson v. McMillian*, 503 U.S. 1, 10 (1992)(internal quotation marks omitted)).

### 4.  Personal Involvement/Cross-Motion for Spoliation Sanctions

Defendants move to dismiss the remaining claims because, they contend, there is no reliable evidence that any of the named defendants were personally involved in the alleged constitutional violations.  Plaintiffs counter that any lack of reliable evidence of Defendants' personal involvement is the result of Defendants' spoliation of evidence.

13

Plaintiffs contend that Defendants irrevocably prejudiced Plaintiffs' claims by intentionally withholding and/or destroying documents that would specifically address the grounds on which Defendants argue Plaintiffs' complaint should be dismissed. Plaintiffs argue that because of the severity of Defendants' "egregious misconduct, the most severe sanctions are required." Dkt. 318-4 at 1. They ask the Court to strike Defendants' answer, or provide another curative sanction, as a remedy for the alleged "intentional, reckless, and/or negligent spoliation of crucial evidence...." *Id.* at 8, 35 Defendants argue that the motion for spoliation sanctions is meritless and should be summarily denied. *See* Dkt. 326 at 6-13.

### Spoliation-Standard

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999); *Bryant v. General Casualty Company of Wisconsin*, 337 F.R.D. 1, 5 (N.D.N.Y Aug. 31, 2020). Even in the absence of a discovery order, a district court may impose sanctions for spoliation through its inherent power to control litigation. *See West*, 167 F.3d at 779. If a party has an obligation to preserve evidence but does not, the degree of the party's culpability and the amount of prejudice caused by its actions will determine the severity of sanctions to be imposed. *See Bryant*, 337 F.R.D. at 6; *Aktas v. JMC Dev. Co., Inc.*, 877 F. Supp. 2d 1, 12 (N.D.N.Y. 2012).

Traditional sanctions include "dismissal of the culpable party's suit, granting summary judgment in favor of the prejudiced party, precluding the culpable party from

giving testimony regarding the destroyed evidence, or giving an adverse inference instruction to the jury against the culpable party." *West*, 167 F.3d at 779.  "Dismissal of a lawsuit, or its analogue, striking an answer, is appropriate if 'there is a showing of willfulness, bad faith, or fault on the part of the sanctioned party.'" *Occhino v. Citigroup Inc.*, No. CV-03-5259 (CPS), 2005 WL 2076588, at *11 (E.D.N.Y. Aug. 26, 2005) (quoting *West*, 167 F.3d at 779). "This high bar is set because dismissal is considered a 'drastic remedy that should be imposed only in extreme circumstances.'" *Richard v. Dignean*, 332 F.R.D. 450, 465 (W.D.N.Y. 2019) (quoting *John B. Hull, Inc. v. Waterbury Petroleum Prod., Inc.*, 845 F.2d 1172, 1176 (2d Cir. 1988)).  Other possibilities include further discovery, cost-shifting, or monetary sanctions. *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F. Supp. 2d 456, 464 (S.D.N.Y. 2010); *Liberman v. FedEx Ground Package System, Inc.* , No. 09 Civ. 2423 (RML), 2011 U.S. Dist. LEXIS 4401, at *15-16 (E.D.N.Y. Jan. 18, 2011).

A party seeking sanctions based on spoliation bears the burden of establishing that (1) the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the records were destroyed "with a culpable state of mind"; and (3) the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002); *see LeClair v. Raymond*, No. 19-CV-0028, 2021 WL 105768, at *2 (N.D.N.Y. Jan. 12, 2021) (same).

**Spoliation-Relevant Background**

Plaintiffs contend that Defendants intentionally spoliated inmate interview documents, Certificate of Search forms, and CERT documents that would have demonstrated Defendants' personal involvement in Plaintiffs' claims, as well as identified other witnesses with information relevant to these claims.  *See* Dkt. 318-4 at 23.  Plaintiffs argue that Defendants' "failure to preserve the inmate interview information, the Certificate of Search forms, and the CERT draft documents constitutes a systemic and intentional spoliation of critical evidence...."  *Id.*

### Inmate Interviews

Plaintiffs have presented evidence indicating that after staff at Clinton discovered that Matt and Sweat had escaped, a massive effort to locate and capture the escapees ensued.  This included interviews of inmates, with some interviews conducted by members of DOCCS Crisis Intervention Unit ("CIU") or DOCCS Office of Special Investigations ("OSI").  *See, e.g.*, Pl. Exh. 1, Joswick deposition excerpts ("Joswick Dep.") at 17-19; Pinsonnault Decl., Ex. B (OSI Skiff deposition) at 17-18.  DOCCS personnel conducted approximately 421 inmate interrogations. Pl. Exh. 1 at 21:5-10. The interrogations were documented on "interview sheets" or, if interview sheets were not available, steno pads.  *Id*. at 19:03-20; *see id.* at 25:09-26:22. Once complete, interview sheets and related documentation were collated into a master binder originally kept in the CIU office at Clinton.  Pl. Exh. 1 at 19:12-20:7. Approximately one week after the escape investigation ended on June 28, 2016, CIU turned the binder over to OSI. *Id.* at 20:7-13, 22:6-13.

DOCCS personnel additionally prepared reports for the interrogations that were electronically copied and uploaded into a DOCCS case tracking system. Pl. Exh. 3, Skiff Dep. at 18:24-21:16.  Hard copies of the investigative materials were provided to the case investigator, either physically or through email containing scanned copies of the interview reports, so the material could be uploaded to the case tracking system. *See id.* It is unclear if the hard copies were maintained.

Plaintiff Gomez testified that he was assaulted several times by DOCCS officers while being interrogated about the escape or while being brought to or from an interrogation, but he did not know who the officers were. *See* Pl. Exh. 5 (Carlos Gomez May 18, 2021 deposition transcript).  Plaintiffs argue that although the binder DOCCS CIU personnel prepared during the Matt and Sweat escape investigation (comprised of the inmate interview documents from the June 2015 escape investigation, the OSI Report of Interview forms, and interview documentation uploaded into the DOCCS electronic case management system) should identify the corrections officers who interrogated and allegedly abused Gomez, DOCCS claims those records no longer exist or cannot be located. *See* Pl. Exh. 31 (DOCCS Assistant Deputy Chief Investigator Mark Doherty report re: search for missing documents). Plaintiffs maintain that DOCCS has provided no explanation for the disappearance of these documents.

### Claims arising during the Draft Process

On June 9, 2015, a DOCCS Corrections Emergency Response Team ("CERT") from Eastern Correctional Facility ("Eastern") responded to Clinton to assist in the search for Matt and Sweat.  Pl. Exh. 8 (Eastern CERT Deployment Report); Pl. Exh. 9,

17

deposition transcript for CERT Sergeant 44-3 dated April 28, 2021 ("44-3 Dep.")) at 12:24-14:23.  Although it appears the Eastern CERT team was primarily involved in conducting organized searches to locate Matt and Sweat, some Eastern CERT team officers conducted a draft assignment on June 15 and 16, 2015.  Pl. Exh. 16, CERT Def. 44-34 Dep., at 15:17-21, 16:15-25; Pl. Exh. 17, CERT Def. 44-23 Dep. at 15:25-16:03.  Approximately ten to twelve CERT Officers were assigned to remove inmates from their cells and escort them to a draft processing area. Pl. Exh. 16, CERT Def. 44-34 Dep. at 26:21-27:09.  Lists were created indicating which inmates were to be transferred, their cell location, and the CERT team members who would remove them from their cells. Pl. Exh. 11, Harms Dep. at 22:04-23:17, 41:14-20.  Because the Eastern CERT team was not familiar with the layout of Clinton, Clinton corrections officers, including Clinton Sergeants Guynup and Sweeney, escorted Eastern CERT officers to the cells of the inmates who were being transferred. *Id*. at 21:04-20; Pl. Exh. 9, 44-3 Dep. at 44:24-47:02; *see* Pl. Exh.18 (Excerpt from Cell Block A Logbook) at, p. 2, entry for 4:00 p.m.; Pl. Exh. 5, Gomez Dep. at 64:04-23.

Inmates were taken to a draft processing area where approximately 5 or 6 CERT officers prepared the inmates to be transferred. Pl. Exh.13, CERT Def. 44-7 Dep. at 19:19-20-20:25.  The inmates were strip frisked, Pl. Exh.9, CERT Def. 44-3 Dep. at 44:24-47:02, and then dressed in prison uniforms and placed in mechanical restraints. Pl. Exh.13, CERT Def. 44-7 Dep. at 24:10-15. The CERT officers who conducted the strip frisks filled out Certificate of Search forms. *Id.;* Pl. Exh.11, Harms Dep. at 37:13-38:06; Pl. Exh. 16, CERT Def. 44-64 Dep. at 21:03-20; Pl. Exh.15, page 110 at ¶ 7(A)

18

(inmates being drafted to another facility "are to be strip frisked in accordance with Directive #4910"); Pl. Exh.22, DOCCS Directive #4910 at § V(A), Sample Form 2063. The Certificate of Search forms identified the CERT officers who searched the inmates. Pl. Exh. 11, Harms Dep. at 37:20-38:06; Pl. Exh. 4, 44-11 Dep. at 24:10-21; *see* Pl. Exh. 22, DOCCS Directive #4910 at Sample Form 2063.  It appears that these documents were to be distributed to the superintendent of the transferring facility, the officer in charge of the transfer, and the receiving facility. *See* Pl. Exh.22, DOCCS Directive #4910 at Sample Form 2063.

The inmates were then transported to Upstate on a bus. Once the bus was ready, CERT officers confirmed the itinerary and the identities of the inmates being transferred. Pl. Exh.14, CERT Def. 44-11 Dep. at 22:17-23:02; Pl. Exh.13, CERT Def. 44-7 Dep. at 34:10-23. They also confirmed that the inmates had been strip frisked by checking the Certificate of Search form for the inmate. Pl. Exh.13, CERT Def. 44-7 Dep. at 35:07-16.  After the bus departed, Lt. Harms collected the lists that indicated which inmates were transferred and the CERT officers who had removed them from their cells. Pl. Exh. 11, Harms Dep. at 41:03-42:09.

Plaintiffs Smith, Bonds, Gomez, Chaves, and Matthews assert excessive force claims during the draft process, including while being removed from their cells, in the draft processing area, and on the bus to Upstate. *See* Smith, Bonds, Gomez, Chaves, and Matthews Dep. Transcripts.  Inmates were unable to identify the CERT officers because their uniforms did not have name tags, and because some of the officers wore helmets or things akin to ski masks or other head coverings. *See* Pl. Exh. 5, Gomez

19

Dep. at 70:02-16; Pl. Exh. 19, Smith Dep. at 36:21-37:04; Pl. Exh. 21, Matthews Dep. at 50:23-51:03.  Inmates were additionally threatened with violence if they looked at the CERT officers and were forcefully made to look at the ground. *See, e.g.*, Pl. Exh. 5, Gomez Dep. at 57:08-58:09, 72:03-73:16; Pl. Exh. 4 (OSI Interview Statements) at 2510, 3042, 3072, 3621, 4138, 2925, 4460, 4546, 3101.

Regarding CERT "recorder notes"[5] that could identify which CERT officers participated in particular assignments, CERT Sergeant 44-3 testified that he always kept those notes on his person in his vest pocket but they were destroyed after he went through a swamp during a search operation for Matt and Sweat. Pl. Exh. 9, CERT Def. 44-3 Dep. at 27:22-30:21; *see id.* at 28 (The notes "were destroyed when we were working out in the woods, pushing through swamps. There were times when we were up to our chest in water... being paper, everything just deteriorated and just pretty much fell apart.").  Regarding the lists of inmates that were transferred during the June 15 and 16, 2015 draft that could identify which CERT officers were assigned to remove Plaintiffs from their cells and participated in the draft process, Lieutenant Harms testified that those documents were destroyed when he decided to "stretch [his] legs and go

---

[5] The evidence indicates that during CERT operations, a "recorder" is typically assigned. Def. Exh. A, Dkt. 327, Harms Dep. p. 23; Pl. Exh, 9, 44- 3 Dep. at 23:17-23.  "The recorder is responsible for all documentation in certain incidents, to record the ongoings, any pertinent documentation and assignments." Def. Exh. A, at 23-24.  The "recorder" does this by noting information in a steno pad ("recorder notes"), such as what assignments they were given, which CERT officers participated in the assignment, where the assignment was conducted, and any unusual occurrences that took place. Pl. Exh, 9, 44-3 Dep. at 29:15-19; *see* Pl. Exh. 15 (CERT Manual Ch. 6) at page 94 ("A recorder will be designated . . .").  A recorder was not assigned during the operation at Clinton in June 2015 because there was not enough staff, rather, the sergeants were keeping track of all the documentation. Def. Exh. A, Dkt. 327, Harms Dep. p. 24.  This documentation was turned over to Defendant CERT Sergeant 44-3 daily. Pl. Exh, 9, 44-3 Dep. at 28:21-30:02.

20

through the woods" with his CERT team during a "monsoon" and he fell in a swamp. Pl. Exh. 11, Harms Dep. at 43:20-44:25.

Regarding the Certificate of Search forms that could identify which CERT officers strip frisked Plaintiffs and were in the draft processing area during incidents Plaintiffs complain of, DOCCS claims those records no longer exist or cannot be located. *See* Pl. Exh. 31. Plaintiffs argue that DOCCS provided no explanation for the disappearance of these documents.

**Analysis**

**a. Control Over the Evidence**

Courts in this Circuit have held that the relationship between DOCCS and its employees is "sufficiently closely coordinated" to find that DOCCS employees have control over evidence held by DOCCS. *Richard v. Dignean*, No. 11 Civ. 6013 (EAW), 021 U.S. Dist. LEXIS 234419, at *9 (W.D.N.Y. Dec. 7, 2021); *see Stanbro v. Westchester Cty. Health Care Corp.*, No. 19 Civ. 10857 (KMK)(JCM), 2021 U.S. Dist. LEXIS 163849, at *16 (S.D.N.Y. Aug. 27, 2021)("[Federal district courts have found that . . . state correctional departments and municipalities ultimately bear responsibility for preserving evidence and litigating cases filed by prisoners, and as such, a state correctional department's failure to preserve evidence may be imputed to individual officer defendants in order to avoid unfair prejudice to inmate litigants. . . . Several courts in this circuit have similarly opined on the unique relationship between DOCCS and its correctional officers in the context of spoliated evidence.") (interior quotation marks and citations omitted); *Slater v. Lacapruccia*, No. 13 Civ. 1079S (WMS), 2019

U.S. Dist. LEXIS 66262, at *11 (W.D.N.Y. April 18, 2019)("As this Court previously indicated, however, it concurs in the pronouncements by other members of this court that in suits against individual corrections officers employed by DOCCS where DOCCS is not a defendant, a sufficiently close relationship nonetheless exists to impute DOCCS' control over evidence to the individual officers.")(collecting cases). Based on this case law and the circumstances of this case, the Court finds that DOCCS and Defendants had control over the subject evidence for purposes of the spoliation inquiry.

### b.  Duty to Preserve

The duty to preserve evidence "arises when the party has notice that the evidence is relevant to litigation or... should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001); *see Equal Emp. Opportunity Comm'n v. Draper Dev. LLC*, No. 15-CV-877, 2018 WL 3384427, at *9 (N.D.N.Y. July 11, 2018).  Most commonly, this is when the suit has already been filed. *See Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir.1998); *Pizzella v. Liberty Gas Station & Convenience Store, LLC*, 410 F. Supp. 3d 425, 432 (N.D.N.Y. 2019).  However, the duty to preserve documents also extends to any evidence that a party "knows, or reasonably should know, is relevant [to an] action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003)(citation omitted); *see also Kronisch*, 150 F.3d at 126 (holding that the duty to preserve "arises when the party has notice that the evidence is relevant to litigation - most commonly

22

when [a] suit has already been filed, . . . but also on occasion in other circumstances, as for example when a party should have known that the evidence may be relevant to future litigation").

Here, Defendants had a duty to preserve the inmate interview information.  As Plaintiffs argue, this information was created in connection with the criminal investigation and prosecution of the Matt and Sweat escape which continued from June 6 to at least June 28, 2015 and should have been preserved on that basis alone.  The evidence was also relevant to some form of investigation or litigation arising from the inmate complaints of abuse during the escape investigation, which continued from mid-June 2015 until at least April 2018;[6] to inmate lawsuits against DOCCS based on their

---

[6] The evidence presented on this motion indicates that in mid-June 2015, DOCCS officials became aware of complaints from inmates alleging mistreatment by DOCCS personnel during the escape investigation. *See* Pl. Exh. 1, Joswick Dep. at 22:14-23:11 (indicating that in mid-June 2015, he became aware "through the rumor mill" of inmate allegations of mistreatment during escape interviews); Pl. Exh. 4, OSI Interview Statement at 3251 (a June 8, 2015 OSI Report of Investigation indicating that an inmate "was interviewed regarding his allegation he was assaulted at Clinton C.F. on June 8, 2015" during an escape interview); Pl. Exh. 27, OSI Investigative Reports at 3258 (an Investigative Report documenting the investigation into an allegation made by an inmate's wife on June 19, 2015 that her husband had been assaulted by staff at Clinton during the escape investigation).  Around this time, OSI took possession of the binder comprising all the inmate interviews that had been conducted during the escape investigation. Pl. Exh. 1, Joswick Dep. at 22:06-13.  On August 12, 2015, inmate allegations of abuse during the escape investigation received national attention when news outlets published stories about those allegations. *See, e.g.,* Pl. Exh. 28, Michael Schwirtz and Michael Winerip, *After 2 Killers Fled, New York Prisoners Say Beatings Were Next*, The New York Times (August 12, 2015).  In response, DOCCS issued a public statement stating that the inmate allegations had been under investigation "for several weeks." *Id.*

On August 15, 2015, DOCCS OSI launched a formal investigation into the inmate allegations of abuse during the escape investigation.  Pl. Exh. 29 (OSI Summary re. IAD/15/1257).  During the investigation, OSI investigators interviewed inmates who said they were assaulted by unknown CERT Officers, *see, e.g.*, Pl. Exh. 27, OSI Investigative Reports at 3373-3374; 3375-3377, with one inmate indicating that he was unable to identify the officers who assaulted him because the officers covered their name tags and directed the inmates not to look at them. *Id.*  3489-3490. On April 2, 2018, OSI investigators recommended that all inmate allegations of assault by corrections officers during the Matt and Sweat escape investigation be deemed unsubstantiated. *Id.* at 2464.  One of the reasons OSI investigators gave for this recommendation was that none of the inmates "could identify any particular staff who may have caused such abuse and/or injuries." *Id.*

treatment during the escape investigation, which started being filed as early as July 2015, *see* Pl. Exh. 30 (Petitions of Carlos Gomez and Luke Matthews filed in the New York State Court of Claims); and to the instant litigation, which was filed on June 6, 2016 (Dkt. No. 1) and served on DOCCS on September 7, 2016 (Dkt. No. 18).

Defendants similarly had a duty to preserve the Certificate of Search forms. Those documents were created on June 15 and 16, 2015, and a DOCCS directive requires that those forms be maintained for five years. *See* Pl. Exh. 32, DOCCS Directive 2011 at Page 7.  Thus, the Certificate of Search forms should have been maintained as a matter of DOCCS policy until June 2020, which is after Defendants were served with this litigation.

Plaintiffs present *prima facie* evidence that Defendants had a duty to preserve CERT draft documents. These documents were created pursuant to official CERT procedures on June 15 and 16, 2015, *see* Pl. Exh. 15, CERT Manual Excerpts, page 109 at ¶ 1, and should have been made part of a permanent record. *See id.* at p. 94, ¶ 7.   The circumstances surrounding the destruction of the documents before they were made part of a permanent record goes to Defendants' culpability, not their duty to preserve the documents.

### c. Culpable State of Mind

As Defendants argue, even if the duty to preserve had been breached, sanctions would be warranted only if the party responsible for the loss had a sufficiently culpable state of mind. *See Perez v. Metro Dairy Corp.*, No. 13-CV-2109, 2015 WL 1535296, at *3 (E.D.N.Y. Apr. 6, 2015); *In re WRT Energy Sec. Litig.*, 246 F.R.D. 185, 195 (S.D.N.Y.

24

2007).  A party may establish a culpable state of mind by showing that the evidence

was destroyed knowingly, even if without intent to breach a duty to preserve it, or

negligently. *See Residential Funding Corp.*, 306 F.3d at 107; *Reilly v. Natwest Markets*

*Grp. Inc.*, 181 F.3d 253, 267 (2d Cir. 1999); *Mule v. 3-D Bldg. & Constr. Mgmt. Corp.*,

No. CV-181997, 2021 WL 2788432, at *9 (E.D.N.Y. July 2, 2021); *see also Dataflow,*

*Inc. v. Peerless Ins. Co.*, No. 11-CV-1127, 2013 WL 6992130, at *6 (N.D.N.Y. June 6,

2013)(A culpable state of mind "must, at a minimum, constitute simple negligence.")

(interior quotation marks and citation omitted), *report and recommendation adopted in*

*pertinent part*, No. 11-CV-1127, 2014 WL 148685 (N.D.N.Y. Jan. 13, 2014); *Schwarz v.*

*FedEx Kinko's Office*, No. 08 Civ. 6486 (THK), 2009 U.S. Dist. LEXIS 100200, at *17-18

(S.D.N.Y. Oct. 27, 2009)(Courts in the Second Circuit have determined that "a 'culpable

state of mind' ranges from willful destruction in bad faith to simple negligence.")(citing to

*Residential Funding*, 306 F.3d at 108).  "In determining culpability, a case-by-case

approach is preferable because failure to preserve can occur 'along a continuum of

fault—ranging from innocence though the degrees of negligence to intentionality.'"

*Wandering Dago Inc. v. New York State Office of Gen. Servs.*, No. 13 Civ. 1053

(MAD)(RFT), 2015 U.S. Dist. LEXIS 69375, at *32 (N.D.N.Y. May 29, 2015) (quoting

*Reilly*, 181 F.3d at 267).

### 1.  Tangible Evidence

"As to tangible evidence, in the Second Circuit, the culpable state of mind factor

is satisfied by a showing that the evidence was destroyed knowingly or grossly

negligently, even if without intent to breach a duty to preserve it, or negligently." *Best*

*Payphones, Inc. v. City of New York*, No. 01 Civ. 3934(JG)(VMS), 2016 U.S. Dist. LEXIS 25655, at *17 (E.D.N.Y. Feb. 26, 2016)(internal citations and quotation marks omitted); s*ee Reilly*, 181 F.3d at 268 (adverse inference instruction warranted where plaintiff was able to show through the identification of missing documents that defendants "sanitized" the files in question, amounting to at least gross negligence); *Residential Funding*, 306 F.3d at 108 ("The sanction of an adverse inference may be appropriate in some cases involving the negligent destruction of evidence because each party should bear the risk of its own negligence.").

Plaintiffs argue that the Court should find that Defendants willfully caused inmate interview information, Certificate of Search forms, and other CERT draft documents to be unavailable for this litigation.  Plaintiffs contend that the willfulness of Defendants' conduct is "evident from DOCCS's routine practice of withholding information that would identify corrections officers accused of misconduct to avoid liability." Dkt. 318-4 at 21. Plaintiffs point out that OSI made "no effort to identify corrections officers who allegedly abused inmates if the inmates did not clearly identify them even though they had the ability to identify those officers and the officers had intentionally conducted the operation in a manner so that the inmates could not identify them." *Id.*  Plaintiffs argue that "DOCCS and OSI circumvent[ed] all the record keeping and reporting requirements intended to protect a vulnerable population. It is a system devoid of accountability." *Id.*

Plaintiffs further argue that DOCCS' "improper routine practice of withholding documents identifying abusive [officers] to avoid liability is plainly evident in *Alexander v. Hanson*, a sister case to Plaintiffs' litigation." *Id.*  Defendants contend that Plaintiffs

26

"make a speculative, irrelevant, and ostensibly inappropriate argument that, in a separate lawsuit . . . DOCCS and an individual DOCCS employee 'misled and/or defrauded' the Court and engaged in conduct that was manifestly unjust and contemptible" based on a document discovered in this lawsuit, "but the connection is nonexistent." Dkt. No. 326 at 10. Defendants assert that Plaintiffs' argument relative to *Alexander* is "unfounded and wholly unavailing," and amounts to a "baseless claim of endemic spoliation by pointing to a different case, with different facts, and speculating about what happened." *Id.* Defendants maintain that Plaintiffs "have done much digging, and speculating, in an attempt to unearth a conspiracy of intentional spoliation so as to circumvent defendants' clear entitlement to summary judgment, but have failed to do so." *Id.* at 10-11.

The Court has closely examined the circumstances in *Alexander* but does not conclude that defense counsel engaged in an intentional misrepresentation in that case or that there is a widespread conspiracy to prevent disclosure of evidence that would help plaintiffs in these cases prove liability. It may have been that in *Alexander* there was not as robust discovery as occurred in this case, and defense counsel in *Alexander* may not have been aware of the existence of the document that Plaintiffs point to as the basis of their claim of impropriety in *Alexander*. Nevertheless, questions of fact exist as to the level of culpability for the loss or destruction of relevant documents in this case. Plaintiffs have presented evidence from which a conclusion could be made that DOCCS and Defendants have been at least negligent, if not grossly negligent, in maintaining and disclosing hard copies of interview sheets and related documentation that were

27

collated and placed in a master binder originally kept in the CIU office at Clinton and turned over to OSI.  This includes the hard copies of the reports and other material regarding the interrogations that DOCCS personnel completed.  This material presumably would identify the officers who allegedly assaulted Plaintiff Gomez while being brought to or from an interrogation, while being interrogated, or who witnessed such conduct.  The Court will hold an evidentiary hearing to determine the level of culpability for the failure to maintain and disclose these documents.

The same conclusion is reached as to the hard copies of the Certificate of Search forms, copies of which were potentially distributed to the superintendent of the transferring facility, the officer in charge of the transfer, and the receiving facility. These documents would presumably be relevant to Plaintiffs' claims that their constitutional rights were violated during the draft process in that they could identify the specific officers who committed the underlying alleged acts.

Defendant CERT Sergeant 44-3 testified that recorder notes were destroyed after getting wet when he traveled through a swamp during a search for Matt and Sweat.  Lieutenant Harms explained that the CERT inmate cell removal assignment sheets were destroyed after he decided to stretch his legs and accompany CERT officers on a search during a "monsoon" with the documents in his thigh pocket, and that they were destroyed by water when he fell in a swamp.  Plaintiffs argue that these explanations are incredible.  The Court cannot resolve issues of credibility on the cold record. After the evidentiary hearing the Court will determine the level of culpability for the destruction of these documents.

**Electronically Stored Information**

The failure to preserve electronically stored information is governed by amended Rule 37 of the Federal Rules of Civil Procedure and is now treated differently than tangible evidence. *See* Fed. R. Civ. Pro. 37(e); *see also Best Payphones,* 2016 U.S. Dist. LEXIS 25655, at *12 ("[A]s the law currently exists in the Second Circuit, there are separate legal analyses governing the spoliation of tangible evidence versus electronic evidence.").

> "Whereas the previous version of Rule 37 permitted severe sanctions for negligent spoliation, pursuant to amended Rule 37(e), the movant must now show that the non-moving party 'acted with the intent to deprive [the movant] of the information's use in the litigation' before the sanctions listed in subsection (2) of Rule 37(e) -- *i.e.*, adverse inference, dismissal, or default judgment -- are available." *Fashion Exch. LLC v. Hybrid Promotions, LLC*, No. 14-CV-1254, 2019 U.S. Dist. LEXIS 218286, 2019 WL 6838672, at *3 (S.D.N.Y. Dec. 16, 2019)(quoting Fed. R. Civ. P. 37(e)(2)); *see also Lokai Holdings*, 2018 U.S. Dist. LEXIS 46578, 2018 WL 1512055, at *8; *Leidig v. Buzzfeed, Inc.*, No. 16-CV-0542, 2017 U.S. Dist. LEXIS 208756, 2017 WL 6512353, at *7 (S.D.N.Y. Dec. 19, 2017). Absent a showing of "intent to deprive," the moving party's relief is limited to sanctions under subsection (1) of Rule 37(e) -- *i.e.*, monetary sanctions, forbidding the party that failed to preserve information from putting on certain evidence, permitting the parties to present evidence and argument to the jury regarding the loss of information, or giving the jury instructions to assist in its evaluation of such evidence or argument. *See Lokai Holdings*, 2018 U.S. Dist. LEXIS 46578, 2018 WL 1512055, at *8 (citing Fed. R. Civ. P. 37(e)(1) Advisory Committee Note, 2015 Amendment). A Rule 37(e)(1) sanction may only be imposed upon a finding of "prejudice" from the loss of the information, and the sanction imposed may be "no greater than necessary to cure the prejudice." *Id*.
>
> "In addition to any other sanctions expressly contemplated by Rule 37(e), as amended, a court has the discretion to award attorneys' fees and costs to the moving party, to the extent reasonable to address any prejudice caused by the spoliation." *Id.* (citing *CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 499 (S.D.N.Y. 2016)). Ultimately, "[t]he decision of what type of sanction is appropriate in a given case is left to the sound

discretion of the district court." *Tchatat v. O'Hara*, 249 F. Supp. 3d 701, 2017 WL 1379097, at *4 (S.D.N.Y. 2017) (collecting cases).

*Mule*, 2021 U.S. Dist. LEXIS 124711, at *19-20.

"When a party has a 'known duty to preserve,' that party's 'conscious dereliction of a known duty to preserve electronic data is both necessary and sufficient to find that the party 'acted with the intent to deprive another party of the information's use' under Rule 37(e)(2).'" *Doe v. Wesleyan Univ.*, No. 3:19-CV-01519 (JBA), 2022 WL 2656787, at *15 (D. Conn. July 8, 2022)(quoting *Ungar v. City of N.Y.*, 329 F.R.D. 8, 13 (E.D.N.Y. 2018)). "Thus, whether the spoliator affirmatively destroys the data, or passively allows it to be lost, that party may be sanctioned for the spoliation of evidence." *Id.* (citing *Moody v. CSX Transp.*, Inc., 271 F. Supp. 3d 410, 428-29 (W.D.N.Y. 2017) ("While knowing they had a duty to preserve the event recorder data, defendants allowed the original data on the event recorder to be overwritten.... On this record, the Court finds that defendants acted with the intent to deprive [plaintiff] of the use of the event recorder data"); *Ottoson v. SMBC Leasing &Fin., Inc.*, 268 F. Supp. 3d 570, 582-83 (S.D.N.Y. 2017) (conscious failure "to take any reasonable steps to preserve" relevant communications can satisfy the intent required of Rule 37(e)(2)) (collecting cases)).

Based on the present record, the Court cannot conclude whether DOCCS or Defendants intentionally lost or destroyed electronically copied versions of documents that were uploaded into the DOCCS case tracking system with an intent to deprive Plaintiffs of this evidence.  The Court will hold an evidentiary hearing to resolve this issue.

### d.  Relevance

Finally, the Court must determine relevance, meaning "whether there is any likelihood that the destroyed evidence would have been of the nature alleged by the party affected by its destruction." *Kronisch*, 150 F.3d at 127. Plaintiffs, as the "prejudiced party," have the burden to produce some evidence suggesting that documents relevant to substantiating their claims would have been included among the destroyed records. *Id*. at 128. Courts must take care not to "hold[ ] the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed [or unavailable] evidence," because doing so "would subvert the purposes of the adverse inference, and would allow parties who have ... destroyed evidence to profit from that destruction." *Id.*

The Second Circuit has held that "[a]lthough we have stated that, to obtain an adverse inference instruction, a party must establish that the unavailable evidence is 'relevant' to its claims or defenses, our cases make clear that 'relevant' in this context means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence." *Residential Funding Corp.*, 306 F.3d at 108–09 (citations omitted). "Rather, the party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction." *Id*. at 109 (citations and interior quotation marks omitted).

> Where a party destroys evidence in bad faith, that bad faith alone is sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence was unfavorable to that party. *See, e.g., Kronisch*, 150 F.3d at 126 ("It is a well-established and long-standing principle of law that a party's intentional destruction of evidence

relevant to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction."). Similarly, a showing of gross negligence in the destruction or untimely production of evidence will in some circumstances suffice, standing alone, to support a finding that the evidence was unfavorable to the grossly negligent party. *See Reilly*, 181 F.3d at 267–68. Accordingly, where a party seeking an adverse inference adduces evidence that its opponent destroyed potential evidence (or otherwise rendered it unavailable) in bad faith or through gross negligence (satisfying the "culpable state of mind" factor), that same evidence of the opponent's state of mind will frequently also be sufficient to permit a jury to conclude that the missing evidence is favorable to the party (satisfying the "relevance" factor).

A party seeking an adverse inference instruction need not, however, rely on the same evidence to establish that the missing evidence is "relevant" as it uses to establish the opponent's "culpable state of mind."  For example, in [*Byrnie v. Town of Cromwell*, 243 F.3d 93 (2d Cir.2001)], the party seeking the adverse inference established relevance through deposition testimony regarding the nature of the missing documents, which we held were likely "relevant" for purposes of an adverse inference in light of the opponent's shifting theory of the case. *Byrnie*, 243 F.3d at 109–10.

*Id.*

"Nonetheless, a court should never impose spoliation sanctions of any sort unless there has been a showing—inferential or otherwise—that the movant has suffered prejudice." *GenOn Mid–Atlantic, LLC v. Stone & Webster, Inc.*, 282 F.R.D. 346, 353 (S.D.N.Y. 2012), *aff'd*, 2012 WL 1849101 (S.D.N.Y. May 21, 2012).  "Proof of relevance, however, does not necessarily equal proof of prejudice." *In re Keurig Green Mt. Single-Serve Coffee Antitrust Litig.*, 341 F.R.D. 474, 495 (S.D.N.Y. 2022)(cleaned up).  "The moving party must come forward with plausible, concrete suggestions as to what the destroyed evidence might have been." *Id.* (cleaned up); *see Karsch*, 2019 U.S. Dist. LEXIS 106971, 2019 WL 2708125, at *21 ("It is sufficient if the existing evidence

plausibly suggests that the spoliated ESI could support the moving party's case.")(quotation marks and citation omitted).

Further, as to electronically stored information, the intent standard for imposing the "particularly harsh" sanctions under Rule 37(e)(2) "is both stringent and specific." *In re Keurig Green Mt. Single-Serve Coffee Antitrust Litig.*, 341 F.R.D. at 496 (cleaned up). "Rule 37(e)(2) contemplates not merely the intent to perform an act that destroys [electronically stored information] but rather the intent to actually deprive another party of evidence." *Id.* (cleaned up).  "If an intent to deprive is found, no separate showing of prejudice is required, because the finding of intent to deprive supports an inference that the opposing party was prejudiced by the loss of information.'" *Id.* (cleaned up).

Here, as to the tangible evidence that Plaintiffs contend they were deprived, Plaintiffs have presented extrinsic evidence indicating that the documents would have provided them with information of the Defendants' personal involvements in the alleged constitutional violations.  As to hard copies of inmate interview information, Defendants correctly argue that such evidence is only relevant to Plaintiff Gomez's claim that he was subjected to excessive force during an interview.  Nevertheless, the evidence would ostensibly be relevant to determining whether any of the Defendants committed the acts alleged or witnessed them yet failed to intervene to stop them.

As to Certificate of Search forms, Defendants argue that the potential relevance of this evidence "is limited because most plaintiffs do not allege that they were assaulted during a strip frisk.  . . .  It appears that only plaintiff Smith indicated that unspecified CERT officers who allegedly struck him were the same officers who strip

frisked him." Dkt. No. 326 at 13 (record citations omitted). While this may be true, the evidence is potentially relevant to Smith's claim. Further, the Certificate of Search forms may indicate the CERT defendants who were present during the draft procedure and therefore may be relevant to identifying Defendants who allegedly committed other constitutional torts during the draft process, or who may have been present yet failed to intervene to stop unconstitutional conduct. Therefore, this evidence is potentially relevant to claims beyond that presented by Smith.

The other CERT documents that were destroyed by submersion in water are also potentially relevant to Plaintiffs' other claimed constitutional violations occurring during the draft process, including claims that CERT defendants used excessive force during or in the process of removing Plaintiffs from their cells for the draft, during the draft process, or during transport to Upstate. Thus, Plaintiffs have presented *prima facie* evidence upon which to conclude that the documents could allow Plaintiffs to withstand Defendants' summary judgment motion based upon the lack of personal involvement.

After the evidentiary hearing which will allow the Court to assess the level of culpability for the failure to produce these documents, the Court will be able to determine what if any sanctions are appropriate. With respect to prejudice, the Court will apply the preponderance of the evidence standard. *See In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 341 F.R.D. at 496.

Likewise, at the evidentiary hearing the Court will be able to assess whether DOCCS and Defendants' failure to preserve electronically stored information was done with an intent to deprive Plaintiffs of this evidence. Upon deciding this issue, the Court

34

will be able to determine what if any sanctions are appropriate for the failure to preserve and provide the electronically stored information. With respect to bad faith and intent to deprive, the Court will apply the clear and convincing standard. *See id.*

### e. Conclusion-Motions for Summary Judgment/Spoliation

Because Plaintiffs' opposition to Defendants' motion for summary judgment is primarily based upon their cross-motion for spoliation sanctions, and because the spoliation motion cannot be resolved without an evidentiary hearing, the Court will reserve on the majority of the summary judgment motion and all of the spoliation motion pending the evidentiary hearing.

## V.    CONCLUSION

Plaintiffs' Motion to Seal and Declassify Documents, Dkt. Nos. 318, 318-1, 318-2, is **GRANTED** as indicated above, and counsel for the parties shall confer and submit within three (3) weeks of this Decision and Order proposed documents complying with the Court's rulings.

Defendants' motion for summary judgment, Dkt. No. 308, is **GRANTED in part and RESERVED in part**. The motion is granted to the extent that Plaintiff Smith's Equal Protection and Title VI claims are **dismissed with prejudice**, and any claim by Plaintiff Chaves for being kicked in the leg by a CERT officer while waiting in the draft processing area is **dismissed with prejudice**. The motion is **reserved** in all other respects pending the outcome of the spoliation evidentiary hearing.

Plaintiffs' cross-motion for spoliation sanctions, Dkt. No. 318-4, is **RESERVED** pending the outcome of the spoliation evidentiary hearing.

Counsel for the parties shall consult with the Court's Courtroom Deputy to schedule the spoliation evidentiary hearing.

The Clerk of the Court may terminate the New York State Department of Corrections and Community Supervision as a defendant in this action.

**IT IS SO ORDERED.**

Dated:  March 28, 2023

Thomas J. McAvoy
Senior, U.S. District Judge

36