UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

LUKE MATTHEWS; CARLOS GOMEZ;
GENTL BONDS; ROBERT SMITH; and
KASIEM CHAVES,

                Plaintiffs,

v.                                    9:17-CV-0503 (GTS/ML)

L. SWEENEY, Clinton Corr. Sergeant;
MICHAEL GUYNUP, Clinton Corr. Lieutenant;
CORR. EMERGENCY RESPONSE TEAM ("CERT")
OFFICER 44-3; CERT OFFICER 44-4;
CERT OFFICER 44-5; CERT OFFICER 44-23; and
CERT OFFICER 44-29;

                Defendants.
_____

APPEARANCES:                          OF COUNSEL:

BEDLOCK, LEVINE & HOFFMAN        DAVID B. RANKIN, ESQ.
   Counsel for Plaintiffs               JONATHAN C. MOORE, ESQ.
99 Park Avenue, 26th Floor           MARC A. CANNAN, ESQ.
New York, NY 10016

HON. LETITIA A. JAMES              DAVID C. WHITE, ESQ.
Attorney General for the State of New York  THOMAS A. CULLEN, ESQ.
   Counsel for Defendants           MARK G. MITCHELL, ESQ.
The Capitol
Albany, NY 12224

GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

      Currently before the Court, in this prisoners civil rights action filed by the five

above-captioned individuals ("Plaintiffs") against the seven above-captioned employees of the

New York State Department of Corrections and Community Supervision ("Defendants"), are the

following: Plaintiffs' cross-motion for spoliation sanctions (Dkt. No. 318, Attach. 4); and those

portions of Defendants' motion for summary judgment (Dkt. No. 308) on which decision was reserved in the Decision and Order dated March 28, 2023 of Senior U.S. District Judge Thomas J. McAvoy, from whom this case has been reassigned (Dkt. Nos. 329, 356).   For the reasons set forth below, Plaintiffs' cross-motion for spoliation sanctions is denied without prejudice, and the remaining portions of Defendants' motion for summary judgment are denied.

## I.      RELEVANT BACKGROUND

### A.      Parties' Pre-Spoliation Hearing Briefing

Generally, in their pre-hearing brief, Defendants essentially assert three arguments: (1) Defendants Guynup and Sweeney played no role in creating or maintaining any of the spoliated materials sought by Plaintiffs, and CERT Officer 44-5 and CERT Officer 44-23 played no role in maintaining control of any of the relevant CERT documentation sought by Plaintiffs (nor where they even present during the constitutional violations alleged by Plaintiffs); (2) although the material in question was within the possession and control of CERT Lieutenant Michael Harms and CERT Officer 44-3, their explanation will show that any withholding or destruction of that material was not intentional or even negligent, but was caused by the unprecedented circumstances surrounding the underlying escape of two inmates from Dannemora Correctional Facility in June 2015; and (3) under the circumstances, the testimony and evidence provided by Defendants will show that, to the extent a sanction is warranted, it is not the most-severe sanction sought by Plaintiffs (striking Defendants' Answer) but a lesser one that is molded to serving the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine.   (Dkt. No. 337, Attach. 1.)

Generally, in their pre-hearing brief, Plaintiffs assert three arguments: (1) because Defendants fail to point to any reasonable steps they took to preserve the binder and electronic case file containing inmate interview information, and strip search forms (and indeed they fail to explain why the relevant evidence is not available), and because the lost evidence is highly relevant to Plaintiffs' claims, the circumstances support a reasonable inference that Defendants acted intentionally; (2) at the spoliation hearing, Plaintiffs will examine both CERT Defendant 44-3 and Lieutenant Harm regarding their explanation of their spoliation the CERT recorder notes and CERT inmate cell removal assignment sheets, and in so doing Plaintiffs will show that, at the very least, the spoliation that occurred supports a reasonable inference of intentional conduct; and (3) as a result, the Court should either (a) strike Defendants' Answer (or issue another curative spoliation sanction) or (b) deny Defendants' motion for summary judgment. (Dkt. No. 338.)

Generally, in their supplemental pre-hearing brief, Defendants assert two arguments: (1) Plaintiffs' cross-motion for spoliation sanctions should be denied in its entirety because it seeks the drastic remedy of an Order striking Defendants' Answer, which is not warranted because Defendants, most of whom were not responsible for the loss or destruction of the evidence in question, did not act intentionally; and (2) Plaintiffs cannot demonstrate the elements of a culpable state of mind and prejudice sufficient to support an award of even lesser sanctions for five reasons: (a) the inmate interview sheets demanded by Plaintiffs have now been disclosed, eliminating any prejudice to Plaintiffs resulting from the loss of those documents; (b) any prejudicial effect caused by the loss of the Certificate of Search forms has been mitigated by Defendants' production of the names of the officers who transported Plaintiffs to Upstate

Correctional Facility on June 15-16, 2015 (obtained from the Commanders logbook and a list of the incarcerated individuals who were transported on those dates); (c) the loss of the CERT recorder notes and the CERT inmate cell removal assignment sheets was inadvertent, caused by an unprecedented emergency of the utmost severity for DOCCS in 2015, which gave rise to a complicated, multi-agency manhunt in the rain; (d) Defendants' failure to preserve electronically stored information was excusable in light of the diligence with which they searched for that information, the ordinary custom and practice of OSI in 2015, and the location and disclosure of the Commanders logbook and inmate interview records; and (e) Defendants were not culpable for the reasons stated in their original pre-hearing brief.   (Dkt. No. 346, Attach. 1.)

Generally, in their supplemental pre-hearing brief, Plaintiffs assert two arguments: (1) Defendants' belated production of Jeffrey Joswick's scanned copies of the inmate interview information establishes that they willfully withheld that information in bad faith, because Defendants' counsel did not bother to interview Mr. Joswick (the person who had been in charge of implementing and managing the inmate interrogation operation and ask him if he had information to identify which correction officers interviewed which inmates) during nearly seven-and-a-half years of litigation; and (2) Defendants' belated production of the inmate interview information does not cure the prejudice suffered by Plaintiff Carlos Gomez, because (a) it caused him to spend several years of an inordinate amount of time and money to take depositions, make discovery demands, and make discovery motions to try and obtain that information, and (b) had Defendants timely produced this information, Plaintiff Gomez would have been able to timely identify the persons responsible for his injuries, make them a party to this lawsuit, depose them while their memories of the incident were still intact, and timely locate

other witnesses to support his claims, which he cannot now given that the three-year statute of limitations expired more than five years ago.   (Dkt. No. 348.)

B.      **Spoliation Hearing and Post-Hearing Briefing**

A 140-minute spoliation hearing was held on February 28, 2024.   (Text Minute Entry dated Feb. 28, 2024.)   At the hearing, four witnesses testified: (1) Correctional Emergency Response Team ("CERT") Lieutenant Michael Harms; (2) CERT Defendant 44-3; (3) former Clinton Correctional Facility Crisis Intervention Unit ("CIU") Team Leader Jeffrey Joswick; and (4) New York State Department of Corrections and Community Supervision ("DOCCS") Office of Special Investigations ("OSI") Deputy Chief Investigator Mark Doherty.

In addition, nine exhibits were received into evidence: (1) Exhibit D-1 containing the Affidavit of DOCCS Associate Counsel, Marat Skholnik, dated November 6, 2023; (2) Exhibit D-2 containing an undated statement by DOCCS Assistant Deputy Chief Investigator Mark Doherty; (3) Exhibit D-3 containing a List of Inmate Interviews listing inmates interviewed at the Clinton County Correctional Facility as part of the Matt and Sweat investigation, with the investigator and/or unit who performed the interviewed (Bates Stamped 5817 – 5888);   (4) Exhibit D-4 containing Inmate Interviews of inmates interviewed at the Clinton County Correctional Facility as part of the Matt and Sweat investigation, served on Plaintiffs' counsel on November 2, 2023 (Bates Stamped 5895 – 6199); (5) Exhibit D-5 containing the Commander's logbook from June 15-16, 2015, listing the officers who transported incarcerated individuals to Upstate Correctional Facility (Bates Stamped 2017 – 2021); (6) Exhibit D-6 containing a list of the incarcerated individuals who were transported to Upstate Correctional Facility on June 15-16, 2015 (Bates Stamped 1905 – 1907); (7) Exhibit P-1 containing excerpts from the

Guidelines for CERT Operations (i.e., the cover-page and Index at Bates Stamped 2015 – 2016, the "Frisk and Search Procedures" at Bates Stamped 1845 – 1849, and the "Draft Procedures" at Bates Stamped 1861 – 1864); (8) Exhibit P-2 containing a July 13, 2015, CERT Memorandum regarding a Clinton Escape Deployment Report (Bates Stamped 2030 – 2032); and (9) Exhibit P-3 containing a blank calendar page printout for June 2015.

Generally, in their post-hearing brief, Plaintiffs repeat arguments made in their pre-hearing briefs.   (*Compare* Dkt. No. 361 *with* Dkt. No. 318, Attach. 4 *and* Dkt. No. 338 *and* Dkt. No. 348.)   Refined arguments worthy of mention are (1) Plaintiffs' argument that the hearing witnesses' testimony does not explain the spoliation of inmate cell removal assignment sheets and recorder notes from the draft that occurred on the evening of June 16, 2015 (which was *after* the CERT team's last foray through the swamps earlier that day), and (2) Plaintiffs' argument that the purportedly "mitigating" documents produced by Defendants do not provide Plaintiffs with the information they seek (i.e., which CERT officers participated in processing Plaintiffs, including the strip-searching of them, before they were placed on the bus).   (Dkt. No. 361, at 4-7.)

Generally, in their post-hearing response brief, Defendants repeat arguments made in their pre-hearing briefs.   (*Compare* Dkt. No. 362 with Dkt. No. 323 *and* Dkt. No. 337, Attach. 1 *and* Dkt. No. 346, Attach. 1.)

## II.    GOVERNING LEGAL STANDARD

The governing legal standard was previously stated by Judge McAvoy in his Decision and Order of   March 28, 2023 (*see* Dkt. No. 329, at 14-15, 24-30), which the Court will repeat here for the convenience of the reader.

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999); *Bryant v. General Casualty Company of Wisconsin*, 337 F.R.D. 1, 5 (N.D.N.Y Aug. 31, 2020). Even in the absence of a discovery order, a district court may impose sanctions for spoliation through its inherent power to control litigation. *West*, 167 F.3d at 779. If a party has an obligation to preserve evidence but does not, the degree of the party's culpability and the amount of prejudice caused by its actions will determine the severity of sanctions to be imposed. *Bryant*, 337 F.R.D. at 6; *Aktas v. JMC Dev. Co., Inc.*, 877 F. Supp. 2d 1, 12 (N.D.N.Y. 2012).

Traditional sanctions include "dismissal of the culpable party's suit, granting summary judgment in favor of the prejudiced party, precluding the culpable party from giving testimony regarding the destroyed evidence, or giving an adverse inference instruction to the jury against the culpable party." *West*, 167 F.3d at 779. "Dismissal of a lawsuit, or its analogue, striking an answer, is appropriate if 'there is a showing of willfulness, bad faith, or fault on the part of the sanctioned party.'" *Occhino v. Citigroup Inc.*, 03-CV-5259, 2005 WL 2076588, at *11 (E.D.N.Y. Aug. 26, 2005) (quoting *West*, 167 F.3d at 779). "This high bar is set because dismissal is considered a 'drastic remedy that should be imposed only in extreme circumstances.'" *Richard v. Dignean*, 332 F.R.D. 450, 465 (W.D.N.Y. 2019) (quoting *John B. Hull, Inc. v. Waterbury Petroleum Prod., Inc.*, 845 F.2d 1172, 1176 (2d Cir. 1988)). Other possibilities include further discovery, cost-shifting, or monetary sanctions. *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F. Supp. 2d 456, 464 (S.D.N.Y. 2010); *Liberman v. FedEx Ground*

*Package System, Inc.*, 09-CV-2423, 2011 U.S. Dist. LEXIS 4401, at *15-16 (E.D.N.Y. Jan. 18, 2011).

A party seeking sanctions based on spoliation bears the burden of establishing the following three elements: (1) the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the records were destroyed "with a culpable state of mind"; and (3) the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002); *accord, LeClair v. Raymond*, 19-CV-0028, 2021 WL 105768, at *2 (N.D.N.Y. Jan. 12, 2021).

With regard to the second element, a party may establish a culpable state of mind by showing that the evidence was destroyed knowingly, even if without intent to breach a duty to preserve it, or negligently. *Residential Funding Corp.*, 306 F.3d at 107; *Reilly v. Natwest Markets Grp. Inc.*, 181 F.3d 253, 267 (2d Cir. 1999); *Mule v. 3-D Bldg. & Constr. Mgmt. Corp.*, 18-CV-1997, 2021 WL 2788432, at *9 (E.D.N.Y. July 2, 2021).   "In determining culpability, a case-by-case approach is preferable because failure to preserve can occur 'along a continuum of fault—ranging from innocence though the degrees of negligence to intentionality.'" *Wandering Dago Inc. v. New York State Office of Gen. Servs.*, 13-CV-1053, 2015 U.S. Dist. LEXIS 69375, at *32 (N.D.N.Y. May 29, 2015) (quoting *Reilly*, 181 F.3d at 267).   By the term "negligence" in this context, courts in the Second Circuit mean ordinary or simple negligence.   *See Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 113 (2d Cir. 2002) ("[D]iscovery sanctions, including an adverse inference instruction, may be imposed upon a party that has breached a discovery obligation not only through bad faith or gross negligence, but also through

ordinary negligence . . . .").[1] "As to tangible evidence, in the Second Circuit, the culpable state of mind factor is satisfied by a showing that the evidence was destroyed knowingly or grossly negligently, even if without intent to breach a duty to preserve it, or negligently." *Best Payphones, Inc. v. City of New York*, 01-CV-3934, 2016 U.S. Dist. LEXIS 25655, at *17 (E.D.N.Y. Feb. 26, 2016) (internal citations and quotation marks omitted); *see Reilly*, 181 F.3d at 268 (finding an adverse inference instruction warranted where plaintiff was able to show through the identification of missing documents that defendants "sanitized" the files in question, amounting to at least gross negligence); *Residential Funding*, 306 F.3d at 108 ("The sanction of an adverse inference may be appropriate in some cases involving the negligent destruction of evidence because each party should bear the risk of its own negligence.").

As to electronically stored information, the failure to preserve such information is governed by amended Fed. R. Civ. P. 37 and is now treated differently than tangible evidence. Fed. R. Civ. Pro. 37(e); *see also Best Payphones*, 2016 U.S. Dist. LEXIS 25655, at *12 ("[A]s the law currently exists in the Second Circuit, there are separate legal analyses governing the spoliation of tangible evidence versus electronic evidence.").

> "Whereas the previous version of Rule 37 permitted severe sanctions for negligent spoliation, pursuant to amended Rule 37(e), the movant must now show that the non-moving party 'acted with the intent to deprive [the

---

[1]    *See, e.g., Wilson v. Hauck*, 141 F. Supp.3d 226, 230 (W.D.N.Y. 2015) ("A culpable state of mind may be satisfied by a showing that the destruction was undertaken in bad faith, or was the result of either gross negligence or simple negligence."); *Rabenstein v. Sealift, Inc.,* 18 F.Supp.3d 343, 362 (E.D.N.Y. 2014) ("A culpable state of mind must, at a minimum, constitute simple negligence." (internal quotation marks omitted)); *Dataflow, Inc. v. Peerless Ins. Co.*, 11-CV-1127, 2013 WL 6992130, at *6 (N.D.N.Y. June 6, 2013) (finding that a culpable state of mind "must, at a minimum, constitute simple negligence") (interior quotation marks and citation omitted), *report and recommendation adopted in pertinent part*, 11-CV-1127, 2014 WL 148685 (N.D.N.Y. Jan. 13, 2014); *Schwarz v. FedEx Kinko's Office*, 08-CV-6486, 2009 U.S. Dist. LEXIS 100200, at *17-18 (S.D.N.Y. Oct. 27, 2009) (observing that courts in the Second Circuit have determined that "a 'culpable state of mind' ranges from willful destruction in bad faith to simple negligence") (citing *Residential Funding*, 306 F.3d at 108).

movant] of the information's use in the litigation' before the sanctions listed in subsection (2) of Rule 37(e) -- i.e., adverse inference, dismissal, or default judgment -- are available." *Fashion Exch. LLC v. Hybrid Promotions, LLC*, No. 14-CV-1254, 2019 U.S. Dist. LEXIS 218286, 2019 WL 6838672, at *3 (S.D.N.Y. Dec. 16, 2019) (quoting Fed. R. Civ. P. 37(e)(2)); *see also Lokai Holdings*, 2018 U.S. Dist. LEXIS 46578, 2018 WL 1512055, at *8; *Leidig v. Buzzfeed, Inc.*, No. 16-CV-0542, 2017 U.S. Dist. LEXIS 208756, 2017 WL 6512353, at *7 (S.D.N.Y. Dec. 19, 2017). Absent a showing of "intent to deprive," the moving party's relief is limited to sanctions under subsection (1) of Rule 37(e) -- i.e., monetary sanctions, forbidding the party that failed to preserve information from putting on certain evidence, permitting the parties to present evidence and argument to the jury regarding the loss of information, or giving the jury instructions to assist in its evaluation of such evidence or argument. *See Lokai Holdings*, 2018 U.S. Dist. LEXIS 46578, 2018 WL 1512055, at *8 (citing Fed. R. Civ. P. 37(e)(1) Advisory Committee Note, 2015 Amendment). A Rule 37(e)(1) sanction may only be imposed upon a finding of "prejudice" from the loss of the information, and the sanction imposed may be "no greater than necessary to cure the prejudice." *Id.* "In addition to any other sanctions expressly contemplated by Rule 37(e), as amended, a court has the discretion to award attorneys' fees and costs to the moving party, to the extent reasonable to address any prejudice caused by the spoliation." *Id.* (citing *CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 499 (S.D.N.Y. 2016)). Ultimately, "[t]he decision of what type of sanction is appropriate in a given case is left to the sound discretion of the district court." *Tchatat v. O'Hara*, 249 F. Supp. 3d 701, 2017 WL 1379097, at *4 (S.D.N.Y. 2017) (collecting cases).

*Mule*, 2021 U.S. Dist. LEXIS 124711, at *19-20.

"When a party has a 'known duty to preserve,' that party's 'conscious dereliction of a known duty to preserve electronic data is both necessary and sufficient to find that the party 'acted with the intent to deprive another party of the information's use' under Rule 37(e)(2).'" *Doe v. Wesleyan Univ.*, 19-CV-01519, 2022 WL 2656787, at *15 (D. Conn. July 8, 2022) (quoting *Ungar v. City of N.Y.*, 329 F.R.D. 8, 13 (E.D.N.Y. 2018)). "Thus, whether the spoliator affirmatively destroys the data, or passively allows it to be lost, that party may be sanctioned for the spoliation of evidence." *Id.* (citing *Moody v.*

*CSX Transp., Inc.*, 271 F. Supp. 3d 410, 428-29 (W.D.N.Y. 2017) ("While knowing they had a duty to preserve the event recorder data, defendants allowed the original data on the event recorder to be overwritten.... On this record, the Court finds that defendants acted with the intent to deprive [plaintiff] of the use of the event recorder data"); *Ottoson v. SMBC Leasing &Fin., Inc*., 268 F. Supp. 3d 570, 582-83 (S.D.N.Y. 2017) (finding conscious failure "to take any reasonable steps to preserve" relevant communications can satisfy the intent required of Fed. R. Civ. P. 37(e)(2)) (collecting cases)).

## III.     ANALYSIS

### A.     Plaintiffs' Cross-Motion for Spoliation Sanctions

#### 1.     State of Mind

The Court has carefully considered each of the witnesses' credibility through the totality of circumstances, including factors such as (1) their demeanor, body language, mannerisms, tone of voice, facial expressions, and eye contact, and (2) the internal consistency and corroborated nature of their statements.   *Cf. Donato v. Plainview-Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 634 (2d Cir. 1996) ("[W]e must accord great deference to the trial court's findings regarding credibility because the trial judge is in the best position to evaluate a witness's demeanor and tone of voice as well as other mannerisms that bear heavily on one's belief in what the witness says.").

After carefully considering all of the evidence, the Court can find no intentional conduct or even reckless conduct by any employees of DOCCS.   Instead, the Court can find, by the narrowest of margins, the existence of only slight negligence (as opposed to ordinary or simple negligence).   *See Litchfield and others v. White and Leonard*, 7 N.Y. 438, 442 (N.Y. 1852)

("Negligence is also divided into three corresponding degrees: Gross negligence is the want of slight diligence; ordinary negligence is the want of ordinary diligence; and slight negligence is the want of high or great diligence (Story on Bailments, § 17).").[2]

This hair splitting between slight and ordinary (or simple) negligence requires some explanation.   At the hearing, the witnesses persuasively testified that, during the time in question, there was no location (e.g., the gymnasium used for a sleeping quarters in Clinton C.F., or an outbuilding used as a command post at Dannemora C.F.) where CERT Lieutenant Harms and CERT Defendant 44-3 could have kept their notes (CERT Lieutenant Harms possessing a four-by-seven-inch stenographer's notebook and CERT Defendant 44-3 possessing "recorder notes") that was both secure and convenient (i.e., where they had the necessary access to their notes every day).[3] As a result, the Court finds that it was certainly reasonable that CERT Lieutenant Harms and CERT Defendant 44-3 kept their notes on their persons while they joined in the search for two escaped inmates.   However, the Court finds each man somewhat careless in failing – during the chaos of an unprecedented manhunt – to take the extraordinary precaution of storing their valuable notes in some kind of plastic bag (e.g., wrapping them in an available garbage bag[4] or a common polyethylene grocery bag, or zipping them shut in a common sandwich bag), before placing them in the pockets of their non-waterproof clothing (CERT Lieutenant Harms placing his inmate cell removal sheets in his left hip pocket, and CERT

---

[2]    *See, e.g., Pettinelli Motors, Inc. v. Morreale*, 242 N.Y.S.2d 78, 80 (N.Y. Cnty. Ct., Oneida Cnty. 1963) (distinguishing between gross negligence, ordinary negligence, and slight negligence in context of bailments).

[3]    (Dkt. No. 360, at 8-10, 14-24, 34-35, 37, 39-44, 49 [Hrg. Tr.].)

[4]    (Dkt. No. 360, at 23-24 [attaching hearing testimony of CERT Lieutenant Harms, stating, "When I exited the woods with the team, when that was, I threw out everything in my pockets, including [the water-spoiled, illegible] notebook into a garbage bag they had there . . ."].)

Defendant 44-3 placing his recorder notes in a front pocket of his nylon ballistic vest) and then venturing out in the Adirondack mountains in conditions that presumably forecasted rain[5] and that ended up forcing them to wade through swamps.[6]

Furthermore, the Court can find no negligence with regard to the manner in which DOCCS employees maintained inmate-interview sheets (including how they collated the sheets at the end of the day), given the number of agencies involved in the manhunt and the time constraints imposed by it.   (*See, e.g.,* Dkt. No. 360, at 56-58, 67 [Hrg. Tr.]; Hrg. Exhibit D-2, at 2.)   However, the Court finds (again by only the narrowest of margins) CIU Team Leader Jeffrey Joswick slightly negligent in failing, during or after his deposition, to think (based on opposing counsel's questions)[7] to inform opposing counsel that he might possess, in a subfolder of his emails labeled "Escape," an electronic copy of a binder of inmate-interview sheets.   (Dkt. No. 360, at 59-60, 69-72 [Hrg. Tr.].) Similarly, the Court finds (again by only the narrowest of margins) OSI Deputy Chief Investigator Mark Doherty slightly negligent in failing, despite his

---

[5]   (*See, e.g.,* Dkt. No. 360, at 11-12, 18-19, 22 [attaching hearing testimony of CERT Lieutenant Harms, stating, "It appeared to me that it seemed to rain all the time. . . [T]he magnitude of the rain . . . was definitely unique. . . .   [I]n the woodland search, it was raining from what I remember, overcast gloomy day . . . . As I stated earlier, it was raining, it was gloomy, it was overcast," agreeing that "it was like a monsoon," and agreeing that "the conditions [that] search teams were working in [were] extremely difficult and damp and wet"]; Dkt. No. 360, at 37 [attaching hearing testimony of CERT Defendant 44-3, stating, "The weather conditions were horrendous. It rained almost the entire time we were there"].)

[6]   In response to any argument that it was not the rain but the swamp that destroyed the notes in question, the Court rejects the premise that constant rain over multiple days (in monsoon-like conditions) did not in any way contribute to the breadth and/or depths of the swamps.   In any event, protecting the notes from rain would have also at least partially protected them from the swamp.

[7]   The Court notes that the relevant line of inquiry by opposing counsel during Joswick's deposition was conspicuously absent of any follow-up questions regarding the format of the binder in question (e.g., only hard copy or also electronic).   (Dkt. No. 360, at 69-72 [Hrg. Tr.].)

repeated attempts to diligently locate records requested by the Attorney General's Office, to think to question Joswick and discover the aforementioned electronic copy (based on his deposition testimony).   (*Id*. at 81-85.)

Finally, the Court is unpersuaded by Plaintiffs' argument that the hearing witnesses' testimony does not explain the spoliation of inmate cell removal assignment sheets and recorder notes from the inmate draft procedure that occurred on the evening of June 16, 2015, because that procedure occurred purportedly *after* the CERT team's last foray through the swamps.   *See, supra,* Part I.B. of this Decision and Order.   This is because the Court finds that, at the hearing, CERT Defendant 44-3 testified credibly that he does not recall but he may have conducted his last foray through the swamps on the morning of June 17, 2015, despite the fact that a CERT memo reports the demobilization as having occurred that day.   (Dkt. No. 360, at 44-45 [attaching hearing testimony of CERT Def. 44-3, answering "Not necessarily" to the question, "If June 17th, 2015 was the day you demobilized, you would not push through the swamps that day, correct?" and then testifying, "I mean we could have had a mission first thing in the morning and then demobilized from there, I don't recall."].)[8]   The Court renders this finding

_____

[8]      The Court concedes that the relevant entry from the Eastern CERT Deployment Report of July 13, 2015, does not state that the Eastern CERT Team conducted a search on the morning of June 17, 2015.   (Hrg. Ex. P-2, at 3.)   However, the remaining portions of that Report (at least the unredacted ones) also do not state that the Eastern CERT Team conducted a search on the mornings of June 9, 2015, through June 16, 2015.   (*See generally* Hrg. Ex. P-2.)   Moreover, it appears from the Report that a DOCCS bus ride between Eastern C.F. and Clinton C.F. takes approximately four hours and fifty-five minutes.   (Hrg. Ex. P-2, at 2 [indicating a departure from Eastern C.F. at 2:05 a.m. and an arrival at Clinton C.F. at 7:00 a.m. on June 9, 2015].)   It also appears from the Report that the Eastern CERT Team returned to Eastern C.F. at 5:20 p.m. on June 17, 2015, suggesting that it had departed from Clinton C.F. at approximately 12:25 p.m. that day.   (Hrg. Ex. P-2, at 3.)   However, the Report contains no indication of what the Eastern CERT Team was doing between the hours of either 6:00 a.m. or 8:00 a.m. when such searches began (*see* Dkt. No. 360, at 16) and 12:25 p.m. when the Team apparently departed from Clinton C.F.   (*See generally* Hrg. Ex. P-2.)   It is hard to believe that these highly trained, highly motivated professionals (*see, e.g.,* Hrg. Tr, at 4-5, 14-15, 29-30, 46-47) were simply "sleeping

despite the fact that CERT Lieutenant Harms testified that, based on his recollection, the CERT

team's last search would have occurred on June 16, 2015, because he was never asked

specifically whether he was "pushing through the swamps on the 17th" (as CERT Def. 44-3 was

asked).  (*Compare id. with* Dkt. No. 360, at 15-16 [attaching hearing testimony of CERT Lt.

Harms, in which he testified that, based on his "recollection," his search with the Eastern CERT

team "would have been before because they went home on the 17th" then answering "Correct" to

the question, "So it . . . would have been between June 9th and June 16th?"].)

## 2.    Appropriate Sanction

The Court begins its analysis of this issue by observing that, based on the current

briefing, a close question exists regarding whether its above-stated finding of slight negligence is

enough to warrant any sanction at all, because the governing standard requires, at the very least,

ordinary or simple negligence.   *See, supra,* Part II of this Decision and Order (including the

cases set forth in note 1 of this Decision and Order).[9]

The Court also observes that, based on the current briefing, a close question exists

regarding whether Plaintiffs have been materially prejudiced by the above-referenced

---

in" and lazily packing their personal belongings in an open gymnasium (*id*. at 8, 34, 41) for four
to six hours while an unprecedented, uncompleted manhunt raged outside.

[9]    The Court notes that a dispute has long existed regarding whether only two forms of
negligence in fact exist: gross negligence or ordinary negligence (which is sometimes thought to
include slight negligence).   *See, e.g.,* Shelden D. Elliott, *Degrees of Negligence*, 6 S. Cal. L.
Rev. 91, 99-100 (Jan. 1933) ("Although a few of the earlier scholars were of the opinion that this
classification [of obligations and corresponding fault] grouped itself conveniently under three
heads—*lata culpa* (gross neglect), *levis culpa* (ordinary neglect) and *levissima culpa* (slight
neglect)—by far the majority of authorities reject the threefold classification. In reality the
Justinian texts, it has been demonstrated, recognized but two degrees[:] . . . [1] *culpa lata* . . .
[and] [2] *culpa levis* . . . variously referred to as . . . *culpa levissima* . . . .").   However, the Court
need not resolve this dispute in this Decision and Order, because the Court expressly finds that
the conduct in question did not rise to the level of ordinary or simple negligence.

negligence.   This is because, generally, the Court accepts Plaintiffs' arguments of prejudice resulting from the destroyed notes of Lt. Harms and CERT Defendant 44-3.   *See, supra,* Part I.A. of this Decision and Order.   However, the Court also largely accepts Defendants' arguments of mitigation resulting from such things as (1) their production of the names of the officers who transported Plaintiffs to Upstate Correctional Facility on June 15-16, 2015, and (2) their belated production of Jeffrey Joswick's electronic copy of a binder of interview sheets.   *Id.* With regard to this latter piece of information, the Court notes that, as stated earlier, Plaintiff's counsel shares at least some of the responsibility for Joswick's failure to inform Plaintiffs' counsel that he might possess, in a subfolder of his emails, an electronic copy of a binder of interview sheets.   *See, supra,* none 7 of this Decision and Order.   The Court notes also that Plaintiff Gomez has simply not persuaded the Court that, had Defendants timely produced the inmate interview sheets, he would have been reasonably able to timely identify persons allegedly responsible for his injuries (other than Defendant Sweeney).   (*See generally* Dkt. Nos. 338, 348; Hrg. Tr. and Exs.)

Finally, the Court also observes that, based on the current briefing, a close question exists regarding whether Defendants were sufficiently involved in the spoliation.   This is because the Court observes that only one of the named Defendants in this action was *directly* involved in the above-referenced negligence: CERT Defendant 44-3.   The other CERT Defendants appear to have been *indirectly* involved in the above-referenced negligence, in the sense that (1) they were supervised by CERT Lieutenant Harms, (2) some or all of them appear to have accompanied Harms during a search when his notes were destroyed, and/or (3) some of all of them appear to have accompanied CERT Defendant 44-3 (who was the Assistant CERT Team Leader) during a

search when his notes were destroyed.   (*See, e.g.,* Dkt. No. 360, at 14-15, 17, 39-30, 40, 49 [Hrg. Tr.]; Dkt. No. 309, Attach. 2, at 15-17, 29 [attaching pages "14" through "16," and page "27" of Tr. of Depo. of CERT Defendant 44-4]; Dkt. No. 309, Attach. 3, at ¶ 7 [Decl. of CERT Defendant 44-5]; Dkt. No. 309, at 14-17 [attaching pages "13" through "16" of Tr. of Depo. of CERT Defendant 44-23]; Dkt. No. 309, Attach. 4, at 15, 33 [attaching pages "14" and 32" of Tr. of Depo. of CERT Defendant 44-29].)[10]   Moreover, the generally close relationship that exists between DOCCS and its employees (as referenced in the cases cited above in note 10 of this

_____

[10]      The Court acknowledges the case law in this Circuit opining on the generally close relationship between DOCCS and its employees in the context of spoliated evidence.  *See, e.g., Richard v. Dignean*, 11-CV-6013, 2021 WL 5782106, at \*3 (W.D.N.Y. Dec. 7, 2021) ("Courts in this District have held that the relationship between DOCCS and its employees is 'sufficiently closely coordinated' to find that DOCCS employees have control over evidence held by DOCCS.") (collecting cases); *Stanbro v. Westchester Cnty. Health Care Corp.*, 19-CV-10857, 2021 WL 3863396, at \*6 (S.D.N.Y. Aug. 27, 2021) ("[Federal district courts have found that . . . state correctional departments and municipalities ultimately bear responsibility for preserving evidence and litigating cases filed by prisoners, and as such, a state correctional department's failure to preserve evidence may be imputed to individual officer defendants in order to avoid unfair prejudice to inmate litigants. . . . Several courts in this circuit have similarly opined on the unique relationship between DOCCS and its correctional officers in the context of spoliated evidence.") (interior quotation marks and citations omitted); *Slater v. Lacapruccia*, 13-CV-1079, 2019 WL 1723515, at \*4 (W.D.N.Y. April 18, 2019) ("As this Court previously indicated, however, it concurs in the pronouncements by other members of this court that in suits against individual corrections officers employed by DOCCS where DOCCS is not a defendant, a sufficiently close relationship nonetheless exists to impute DOCCS' control over evidence to the individual officers.") (collecting cases); *Wilson v. Hauck*, 141 F. Supp. 3d 226, 229 (W.D.N.Y. 2015) ("[T]he relationship between DOCCS and its employees is sufficiently closely coordinated to find that DOCCS employees have control over evidence held by DOCCS."); *Guillory v. Skelly*, 12-CV-0847, 2014 WL 4542468, at \*8 (W.D.N.Y. Sept. 11, 2014) ("[A]lthough DOCCS is not a party to this action, the relationship between DOCCS and Defendants, all DOCCS employees is sufficiently closely coordinated to find Defendants have practical access and control over the requested documents."); *Vigliotti v. Selsky*, 08-CV-0875 M, 2013 WL 3354423, at \*4 (W.D.N.Y. July 3, 2013) ("[D]efendants apparently had sufficient nexus to DOCCS to arrange for the inspection of Wende."); *cf. Vega v. Broome Cnty.*, 21-CV-0788, 2023 WL 6318919, at \*8 (N.D.N.Y. Sept. 28, 2023) (Sannes, C.J.) ("Even where a party lacks actual physical possession or custody of requested documents[,] such party may nevertheless be found to have control of the documents if the party is legally entitled to the documents or has the practical ability to acquire the documents from a third-party.") (internal quotation marks and ellipses omitted).

Decision and Order) appears too attenuated here between two DOCCS line officers on the one

hand (i.e., Defendants Sweeney and Guynup) and an OSI Deputy Chief Investigator (Doherty)

and a CIU Team Leader (Joswick) on the other hand (especially during the unprecedent

circumstances that existed at the time).

      In any event, the Court finds that no need exists to decide these thorny issues in this

Decision and Order.   This is because, even if the Court were to answer each of these three

questions in Plaintiffs' favor, the most-severe sanction that the Court would award would be a

permissible adverse inference that the destroyed evidence would have been of the nature alleged

by Plaintiffs (i.e., each document would have contained one or more statements that are both

consistent with Plaintiffs' allegations and plausible or ordinary in the document in question).[11]

However, Plaintiff does not need the benefit of such a permissible inference in order to defeat the

remainder of Defendants' motion for summary judgment, because, for the reasons stated below

in Part III.B. of this Decision and Order, the Court finds that, based on the admissible record

evidence, genuine disputes of material fact exists preluding the Court from granting the

remainder of Defendants' motion for summary judgment.

      As a result, the Court denies Plaintiff's motion for sanctions but does so only without

prejudice.   Plaintiffs may renew their motion during the pre-trial phase of this action (when the

---

[11]   For example, at most, an inference would permitted that a document would have shown
that a specific CERT Defendant was among those who interviewed a specific Plaintiff and/or
transported a specific Plaintiff from his cell at Clinton C.F. to a bus destined for Upstate C.F.
However, the Court hastens to add that the permissible inference would not include an
accompanying inference that the CERT Defendants prevented the production of the evidence out
of the well-founded fear that the contents would harm them.   In other words, the sanction would
not go so far as to permit an inference that a specific CERT Defendant actually used the force
alleged against a specific Plaintiff (or was reasonably able to intervene in that alleged use of
force): such issues would have to be proved through evidence other than the absence of the
spoliated documents.

Court expects to resolve these issues through, in addition to pre-trial stipulations, decisions on

motions *in limine* and proposed jury instructions).   During that phase, to the extent that Plaintiffs

again request an adverse-inference instruction by motion, Plaintiffs must identify (1) each

particular spoliated document at issue, (2) the particular wording of each adverse-inference

requested, and (3) why, with regard to each particular document, the Court should answer each

of the three above-stated questions in Plaintiffs' favor (including why each piece of resulting

evidence would not be cumulative of evidence already contained in the record).

### B.   Remaining Portions of Defendants' Motion for Summary Judgment

As indicated above in Part III.A.2. of this Decision and Order, with regard to the

remaining portions of the CERT Defendants' motion for summary judgment, the Court finds

that, even without the permissibility of an adverse inference, a genuine dispute of material fact

exists regarding whether the CERT Defendants were present during the constitutional violations

alleged.[12]   Similarly, with regard to the remaining portions of Defendants Sweeney and

Guynup's motion for summary judgment, the Court finds that a genuine dispute of material fact

exists regarding whether Defendant Sweeney was the sergeant who escorted the CERT team that

---

[12]      (*See, e.g.,* Dkt. No. 360, at 37-38, 48-49 [Hrg. Tr., containing testimony of CERT
Defendant 44-3 that he was present during the escorting of inmates], *accord*, Dkt. No. 309,
Attach. 1, at 19-20, 22-23 [attaching pages "18" and "19" of Tr. of Depo. of CERT Defendant
44-3]; Dkt. No. 309, Attach. 2, at 18-20, 22-37, 43-46 [attaching pages "17" through "19," pages
"21" through "36," and pages "42" through "45" of Tr. of Depo. of CERT Defendant 44-4,
testifying that he participated in and/or supervised the "draft" operation involving inmates]; Dkt.
No. 309, Attach. 3, at ¶¶ 7-9 [Decl. of CERT Defendant 44-5, testifying that he supervised some
of the inmate transports during the time in question]; Dkt. No. 309, at 15-18, 21-26, 32 [attaching
pages "14" through "17," pages "20" through "25," and page "31" of Tr. of Depo. of CERT
Defendant 44-23, testifying that on one occasion he was involved in the transporting of prisoners
on a bus from Clinton C.F. to Upstate C.F.]; Dkt. No. 309, Attach. 4, at 15-19, 33 [attaching
pages "1" through "18" and page "32" of Tr. of Depo. of CERT Defendant 44-29, testifying that
he was involved in an inmate transport at Clinton C.F.].)

removed Plaintiff Gomez from his cell on June 16, 2015,[13] and a genuine dispute of material fact exists regarding whether Defendant Guynup was the sergeant who escorted the CERT team that removed Plaintiff Smith from his cell on June 16, 2015.[14]

As a result, the remaining portions of Defendants' motion for summary judgment (which hinges on their purported lack of personal involvement in the constitutional violations alleged) are denied.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiffs' cross-motion for spoliation sanctions (Dkt. No. 318, Attach. 4) is **DENIED without prejudice**, as specified above in Part III.A.2. of this Decision and Order; and it is further

**ORDERED** that the remaining portions of Defendants' motion for summary judgment (*compare* Dkt. No. 308 *with* Dkt. No. 329) are **DENIED**; and it is further

**ORDERED** that a pretrial conference shall be scheduled in this action, at which counsel shall appear with settlement authority.

---

[13]    (*Compare* Dkt. No. 318, Attach. 11, at 27 [attaching page "64" of Gomez Depo. Tr., identifying Sweeney] *with* Dkt. No. 298, at ¶¶ 128-39 [Plfs.' Third Am. Compl., alleging events of 06/16/15 regarding Gomez]; *cf.* Dkt. No. 308, Attach. 9, at 17 [attaching page "16" of Sweeney Depo. Tr., stating that he did not recall seeing any inmates being interviewed when he returned from vacation].)

[14]    (*Compare* Dkt. No. 308, Attach. 10, at 23-24, 27, 31, 35-37, 39-40 [attaching pages "22," "23," "26," "30," "34," "35," "36, "38," and "39" of Guyup Depo. Tr., stating that sometimes he was in the hallways and the waiting area when CERT officers were escorting inmates being transferred to Upstate C.F.] *and* Dkt. No. 332, Attach. 13, at 2-3 [containing 4:00 p.m. entry of Cell Block A Logbook, indicating Def. Guynup's transfer of Plf. Smith] *and* Hrg. Ex. D-5, at 5 [attaching page Bates Stamped 2021, dated 06/16/15, containing name of Def. Guynup] *with* Dkt. No. 298, at ¶¶ 92-116 [Plfs.' Third Am. Compl., alleging events of 06/16/15 regarding Plf. Smith].)

Dated: April 10, 2024
         Syracuse, New York


Glenn T. Suddaby
U.S. District Judge